**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 14-0067-WS-C** |
| | ) |
| **REGIONS BANK,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on the Motion for Summary Judgment (doc. 205) filed by defendant Regions Bank, the Motion for Summary Judgment (doc. 211) filed by defendant George Jones, and the Motion to Strike Declaration of Stephen S. Peterson (doc. 230). All three Motions have been exhaustively briefed, to the tune of nearly 250 pages of briefing and approximately 4,200 pages of exhibits.[1]

**I.     Nature of the Case.**

Despite the volume of paper it has generated, at its core this case is not particularly complex, either factually or legally. In December 2007, plaintiff, Allstate Insurance Company, purchased $12.3 million in infrastructure bonds to finance a real estate project called the Town of SaltAire, on the western shore of Mobile Bay in Mobile County, Alabama. Most of the bond

---

[1]     Large swaths of these exhibits are not addressed in any meaningful way in the parties' briefs. The practice of dumping vast collections of documents into the court file along with dispositive-motion briefs is disfavored. Indeed, the Federal Rules of Civil Procedure specify that "[t]he court need consider only the cited materials" in the summary judgment record. Rule 56(c)(3), Fed.R.Civ.P. The undersigned will not sift through these massive evidentiary submissions searching for uncited factual tidbits that might bolster the position of one side or the other. *See, e.g., Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1338 n.4 (S.D. Ala. 2010) ("[T]his Court will not scour uncited portions of the parties' evidentiary submissions for any scrap of evidence that may advance their positions.") (citations omitted); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions.").

proceeds were initially held in trust pending authorization by Allstate to release the funds.  For its part, Allstate was unwilling to provide the green light until defendant Regions Bank had committed the sum of $16 million to the project.  Although Regions Bank never affirmatively said so, Allstate understood that Regions Bank had already invested $14.5 million in SaltAire.  Regions Bank knew that Allstate was operating under that (mistaken) premise, yet made no attempt to correct it.  In late January 2008, Regions Bank issued a commitment letter for an additional $2 million to the project, in reliance on which Allstate authorized release of the remaining bond proceeds.  Ultimately, the Town of SaltAire project failed and Allstate lost millions of dollars that it had invested in the bonds.

In this lawsuit (originally filed on July 18, 2013), Allstate contends that defendants, Regions Bank and George Jones (the developer's agent), hatched a fraudulent scheme to induce Allstate to release the bond proceeds because the project was faltering and desperate for an infusion of cash to remain afloat.  Specifically, Allstate brings common-law claims of fraudulent/negligent misrepresentation against both defendants, on the theory that "Defendants falsely represented, through Regions' January 30, 2008 commitment letter, that Regions was obligated to lend an additional $2 million to [the project's owner], purportedly raising its total commitment to SaltAire to $16.5 million."  (Doc. 113, ¶¶ 27, 33.)  Allstate also brings a claim of fraudulent concealment/suppression, centered on the allegation that "Defendants concealed from Allstate that Regions had not funded a $14.5 million acquisition and development loan or line of credit to SaltAire in December of 2007."  (*Id.*, ¶ 39.)  Finally, Allstate brings a civil conspiracy cause of action, alleging that Regions Bank and Jones had agreed and conspired to defraud Allstate in the above-described manner.  (*Id.*, ¶ 48.)

Both defendants now move for summary judgment.  In its Motion (doc. 205), Regions Bank contends that it is entitled to dismissal of Allstate's claims because (i) the January 2008 commitment letter contained no misstatements of fact, (ii) Regions Bank owed no duty to Allstate to disclose the true amount of its loan commitment to SaltAire as of December 2007, (iii) Allstate did not justifiably rely on any material misrepresentations or omissions by Regions Bank, (iv) Regions Bank's alleged conduct did not proximately cause Allstate's losses, (v) the negligent misrepresentation claim fails under an Illinois variant of the "economic loss" rule known as the *Moorman* doctrine, (vi) the civil conspiracy claim fails in the absence of an underlying tort, (vii) Allstate's claims are barred by the applicable limitations period, and (viii)

Allstate's alter ego extinguished the bond debt by making full credit bids, such that Allstate has already received the one satisfaction to which it was entitled for the subject losses. Meanwhile, defendant Jones, proceeding *pro se*, filed his own Motion for Summary Judgment (doc. 211) seeking dismissal of plaintiff's claims against him on the grounds of, *inter alia*, untimeliness and nonoccurrence of any fraud.

## II.    Factual Background.[2]

### A.    *The Town of SaltAire.*

Regions Bank's involvement in the SaltAire development commenced in December 2006, when it loaned $325,000 on a short-term, temporary basis to Mobile Bay Investments LLC ("MBI"), the owner of the land being used in the project. (Doc. 226, Exh. 11.)[3]  By December

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in its favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Allstate's] version of the facts drawing all justifiable inferences in [its] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). Many of the facts on which movants rely in their summary judgment presentations are actually submitted in the light most favorable to movants themselves, without regard for conflicting evidence or contrary inferences that may reasonably be drawn from the record. Of course, the governing legal standard on summary judgment precludes this Court from reviewing the factual record in the light most favorable to the Rule 56 movants.

[3]    Plaintiff unilaterally filed four exhibits under seal without prior leave of court. (Doc. 226.) This is improper. *See Administrative Procedure for Filing, Signing and Verifying Documents by Electronic Means in the U.S. District Court for the Southern District of Alabama*, § 3.A. (outlining procedure for motions to file documents under seal). Federal courts have long recognized a strong presumption in favor of allowing public access to judicial records. *See, e.g., Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 11th Cir. 2001) ("The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process. … [T]he common-law right of access includes the right to inspect and copy public records and documents."). Litigants may not override that presumption by simply referencing a protective order. Rather, district courts must scrutinize sealing requests; otherwise, parties could effectively circumvent the public's right of access to judicial documents through the expedient of labeling everything confidential. *See, e.g., Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) ("[P]arties cannot overcome the presumption against sealing judicial records simply by pointing out that the records are subject to (Continued)

2007, Regions Bank had lent a total of $6.5 million to MBI through a series of such short-term operating loans. (Doc. 226, Exh. 15; Arendall Dep., at 52, 113, 366.) Those loans to MBI were secured through a second mortgage on the SaltAire property, which mortgage was behind a $7.5 million first mortgage held by a private investor called Bay Mortgage Investors. (Arendall Dep., at 94; doc. 221, Exh. 16.) To underscore the temporary, transitory nature of Regions Bank's loans on the project, by the terms of the applicable Promissory Note dated December 11, 2007, Regions Bank's loan to MBI was to mature just four months later, in April 2008. (Doc. 226, Exh. 15.) This was short-term operating financing, not long-term development financing.

Defendant George Jones was the manager of an entity called SaltAire Development Group, LLC ("SDG"). (Jones Decl. (doc. 206, Exh. 3, ¶ 1.) SDG was the developer of the SaltAire project. (*Id.*) Jones (along with others at SDG and MBI) worked to form the Belle Fontaine Improvement District (the "District") in August 2007. The District was a type of entity known as an Alabama Improvement District, formed to facilitate financing of public infrastructure improvements for SaltAire via tax-exempt bonds to be issued by the District. (Jones Dep. 11/18/14, at 118-20, 126; doc. 221, Exh. 20.) SDG and Jones selected a company called Gardnyr Michael Capital, Inc. ("Gardnyr Michael") to serve as the bond underwriter for the District, through which its responsibilities included structuring and selling the bonds. (Doc. 222, Exh. 23; Hunt Dep., at 20.) Gardnyr Michael approached Allstate as a potential buyer in the fall of 2007. (Hunt Dep., at 27; Peterson Dep., at Exh. 182.) Materials provided to Allstate by

---

a protective order in the district court. Rather, the parties must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process."); *Visual Min., Inc. v. Ziegler*, 2014 WL 690905, *5 (D. Md. Feb. 21, 2014) ("A protective order regulates the parties' extrajudicial conduct but is not sufficient, by itself, to justify the continued sealing of filings in court."); *Joao Bock Transaction Systems, LLC v. Fidelity Nat'l Information Services, Inc.*, 2014 WL 279656, *1 (M.D. Fla. Jan. 24, 2014) ("Though a stipulated protective order may provide that documents designated confidential are presumptively protected, a party's calling a document confidential pursuant to a protective order does not make it so when it comes to filing the document with the court.") (citation and internal quotation marks omitted); *Procaps S.A. v. Patheon Inc.*, 2013 WL 5928586, *2 (S.D. Fla. Nov. 1, 2013) ("a party's designation of whether a document is 'confidential' under the Protective Order does not control whether the document is entitled to be *sealed*"). Unless a properly supported motion to seal making the necessary showing is filed on or before **July 24, 2015**, the undersigned will instruct the Clerk of Court to unseal docket entry 226 in its entirety.

Gardnyr Michael reflected that the Phase I bond issue was to encompass $12.8 million of tax-exempt, non-rated bonds with a 30-year maturity, and that such bonds were to be used to construct public infrastructure (*i.e.*, roads, bridges, landscaping, water/sewer utilities, boardwalks, a marina club, etc.) for the SaltAire project.  (Peterson Dep., at Exh. 182.)

   **B.**  ***Allstate Agrees to Purchase the Bonds.***

   Allstate's decision maker, an Illinois-based portfolio manager named Steve Peterson, had numerous conversations with Gardnyr Michael representatives, as well as SDG representatives. According to Peterson, "at every point, at every conversation," he discussed what he viewed as "the decisive point" or the "crux of the deal," which was "the character of the capital structure." (Peterson Dep., at 118.)  It was represented to Peterson (by whom, he does not recall) that Regions Bank had provided $14.5 million in financing for the project.  (*Id.* at 118, 171-72.) Peterson was emphatic that he "would not have pursued the deal to that point without that representation," that he "never would have gone forward" without that representation, and that if he had ever encountered a representation "that cast doubt on that $14.5 million, the deal would have stopped right there."  (*Id.* at 171-72, 176.)[4]  There is no indication in the record, and no evidence from which a reasonable finder of fact could find, that Regions Bank directly made such a representation to Peterson or anyone else at Allstate.  Whatever and whoever the source of that initial representation was, it was not Regions Bank.  It was also not accurate.  As stated *supra*, the facts were that Regions Bank had loaned just $6.5 million for the SaltAire project, and

---

[4]   Peterson further testified that "that became the crux of the deal," and that he "never would have even gone to Alabama to visit unless that representation had been made. Now, exactly when it was made and who made it, I don't know, but that, for me, in my analysis, that became the crux of the deal, that Regions Bank had made a loan to the developer for $14.5 million."  (*Id.* at 174-75.)  While Peterson does not remember who made that representation to him or when it was made, plaintiff's evidence is that, during Peterson's site visit to SaltAire on December 11, 2007, Jones informed Peterson (in the presence of others) that Regions Bank had loaned $14 million on the project.  (Hunt Dep., at 217-18.)  An e-mail from Jones to a Gardnyr Michael representative on December 19, 2007, purports to summarize what Jones informed Peterson during the site visit, as follows: "I said Regions already has about $14mm in now; which they do.  I also said we were going for an additional $2mm; which we are!"  (Doc. 222, Exh. 34.)  Another email from Jones to Gardnyr Michael sent two hours later clarifies, "Just thought I would let you know we are at $14.5mm with them now – I told you I thought it was around $14mm – sorry I am not more precise!"  (Doc. 222, Exh. 31.)

that money was not development financing, but rather was in the form of short-term loans to MBI, the owner (not SDG, the developer).[5]

Notwithstanding the assurances from unknown quarters that "Regions Bank had made a loan to the developer for $14.5 million" (*id.* at 175), Peterson's assessment was that a $14.5 million commitment was insufficient to provide Allstate the necessary comfort level to purchase the bonds. Peterson was thus "emphatic" in all conversations with Gardnyr Michael personnel that "the $14.5 million that was represented to be in the deal from the developer needed to be $16 million," and that "the deal would not go forward unless that $16 million from Regions Bank was in the deal to the developer." (*Id.* at 118.) As Peterson put it, "My understanding was the developer had a $14.5 million loan with Regions, and my requirement in order to close the deal was a $16-million loan from Regions." (*Id.* at 258.) The $16 million figure was not arbitrary, but instead reflected Peterson's professional risk assessment that this was an appropriate amount of capital given the circumstances attendant to the SaltAire deal. (*Id.* at 258-59.) Peterson communicated that requirement to SDG and Gardnyr Michael. (*Id.* at 259.)

To accommodate Allstate's prerequisite that Regions Bank must have loaned $16 million to the developer, Gardnyr Michael's solution was to orchestrate an agreement between SDG and the bond trustee "that will not allow the developer to draw more than $1 million out of the Construction Fund UNTIL he has received a binding commitment or actual funding from Regions Bank totaling $16 million." (Doc. 223, Exh. 37.) Such an agreement, commonly described throughout the parties' filings as the "Side Agreement," was indeed prepared and executed by SDG and the bond trustee, with Allstate's joinder and consent, on December 26, 2007. Regions Bank was not a signatory to the Side Agreement.

The recitals of the Side Agreement included the following: (i) the District was issuing $12.3 million in Special Assessment Capital Revenue Bonds dated as of December 1, 2007; (ii) Allstate would purchase the bonds from Gardnyr Michael and would be the beneficial owner of

---

[5]    John Arendall, Regions Bank's "Relationship Manager" on the SaltAire project, confirmed in his deposition that "Regions didn't have 14 at the time." (Arendall Dep. 2/6/11, at 123.) When asked about Allstate's understanding that Regions Bank controlled a $14.5 million loan on the project, Arendall testified, "That's what they said. I'm not sure where they got that." (*Id.* at 124.) Arendall's testimony was unequivocal that, as of December 2007, Regions Bank had not issued a $14.5 million acquisition and development loan for the SaltAire project, but instead had loaned a total of $6.55 million to MBI. (Arendall Dep. 9/29/14, at 50.)

same; (iii) SDG "currently has an acquisition and development loan … controlled by Regions Bank … with respect to [SaltAire] which is currently limited to a fifteen million dollars ($14,500,000) line of credit;"[6] and (iv) SDG "is currently seeking a commitment from the Bank … to increase the Loan's available line of credit to sixteen million dollars ($16,000,000) and expects to get such Commitment from the Bank shortly after the Bonds are issued."  (Doc. 206, Exh. 1, at 1.)  The Side Agreement further specified that Allstate "is purchasing the Bonds upon reliance of the acknowledgments and covenants contained in this Agreement by the Developer." (*Id.* at ¶ 2.)  By its terms, the Side Agreement would forbid the bond trustee from releasing more than $1 million in bond proceeds to SDG until such time as Allstate notified the bond trustee that Regions Bank had satisfactorily committed to increase the loan to $16 million.  (*Id.* at ¶¶ 3-5.)

Peterson accepted the Side Agreement in this form.  (Doc. 223, Exh. 41.)  George Jones executed that Agreement on behalf of SDG.  (*Id.*)  The Side Agreement was thus finalized and approved on December 20, 2007.  With the Side Agreement in place, Allstate moved forward with the purchase of the $12.3 million in bonds on December 26, 2007.  (Doc. 223, Exh. 42.)  In connection with that closing, Jones executed a "Certificate of Developer" on behalf of SDG, wherein he certified that all information SDG had provided to Gardnyr Michael and Allstate in connection with the bond issuance "is true and correct in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading." (Doc. 223, Exh. 44, ¶ 3.)[7]

---

[6]       Jones had tweaked this recital from an initial draft that (i) had specified the amount Regions Bank's loan as $15 million (rather than $14.5 million) and (ii) had characterized the acquisition and development loan as being "with" Regions Bank, rather than "controlled by" Regions Bank.  (Doc. 223, Exh. 36, at 2; Jones Dep. 12/17/14, at 90.)  Peterson was aware of Jones' edits, but viewed them as "perfunctory changes" because he "could not discern a meaningful semantic difference" between the terms "with" and "controlled by."  (Peterson Dep., at 277-78.)

[7]       For its part, Regions Bank did not execute any such certifications or have any communications with Allstate, Gardnyr Michael or the bond trustee concerning the bond closing (although it did sign a Mortgagee Acknowledgment acknowledging that its liens were subordinate to those of the bonds).  (Arendall Dep. 9/29/14, at 68, 71-72; Peterson Dep., at 317-18.)

### C.     *Allstate Releases the Bond Proceeds.*

In accordance with the Side Agreement, only $1 million in bond proceeds were released to SDG after the December 26, 2007 bond closing.  (Doc. 223, Exh. 45.)  The bond trustee continued to hold the remaining construction funds – consisting of the $11.3 million in bond proceeds less various sunk costs and money set aside for certain purposes (Hunt Dep., at 479-81) – in trust pending authorization from Allstate that the funding conditions specified in the Side Agreement had been satisfied.  (Peterson Dep., at 353.)

Allstate's evidence is that the SaltAire project was experiencing significant cash-flow difficulties during this time period.  An e-mail exchange between Jones and John Arendall at Regions Bank dated January 22, 2008 includes dire statements such as (i) Jones telling Arendall "[w]e are in need of $1mm on Friday – that buys another month and some," (ii) Arendall relating to Jones that Johnny Walton (presumably a contractor) "will not do any more work until he is paid," (iii) Arendall notifying Jones that a contemplated "participant" to loan the project $5.4 million had declined, and (iv) Arendall telling Jones that "I made a call yesterday to our worst case scenario guy."  (Doc. 223, Exh. 46.)  E-mails dated January 24 and 30 reflect that SDG had overdrafted its accounts in amounts exceeding $30,000, leaving Jones scrambling to apologize and cover the shortfall.  (*Id.*, Exhs. 47 & 48.)

Faced with these pressing financial woes, Jones and Arendall were keenly aware of the remaining bond funds being held in trust, and the Side Agreement's restrictions on their release.  By January 22, 2008, Jones proposed to Arendall that Regions Bank buy out a $7.5 million loan held by another investor called MCS, and "up your second to $9.5mm – that gets us past the $16mm threshold for release of AID funds."  (Doc. 223, Exh. 46.)[8]  Arendall responded, "Not a bad idea."  (*Id.*)  (It appears that no MCS loan buyout occurred in early 2008.)  On January 28, 2008, Jones requested a meeting with Arendall "to run a plan by you that I think will unlock the AID."  (Doc. 224, Exh. 51.)  The following morning, Jones sent an e-mail to Arendall reading, in pertinent part (with all typos unchanged), as follows:

---

[8]        The reference to "AID funds" can only mean the bond proceeds.  AID is an acronym for "Alabama Improvement District," which would describe the Belle Fontaine Improvement District, the entity that had issued the bonds for the SaltAire project so that they could obtain tax-favored status.

> "To brief you on the plan: I told All State I was after a $2mm to $3mm increase n the Regions line, which would boost the total commitment from Regions to $16mm +. That is the measure of the caviat in the bond funding. Therefore, I believe if you simply give us a letter stating you are increasing our line by X$, or something to that affect we can get those $ unleashed? If you are at $9.5mm + MCS then we are effectivly at or over the $ 16mm threshold – you would not have to fund until we get everything else done but, in truth, you have agreed to increase our line and we are over the mark. With the AID released we have sufficient time to put everything else together!"

(Doc. 222, Exh. 22.)

The very next day, Arendall sent an e-mail to Jones attaching a six-page proposed commitment letter, with the message, "Call me with any questions." (Doc. 224, Exh. 52.) The commitment letter was on Regions letterhead, addressed to Jones at Mobile Bay Investments (again, the landowner for the SaltAire project) and identifying MBI as the borrower. The letter stated, "We hereby commit to make a loan to you" for development of the Town of SaltAire in an amount of "[u]p to $2,000,000, but not to exceed 80% LTV." (*Id.*, at 2.) The commitment letter included an assortment of terms and conditions on which the loan was predicated, including (among others) (i) the loan was subject to appraisal, survey, and environmental site assessment requirements in form and substance acceptable to Regions Bank; (ii) closing was contingent upon execution of documentation deemed satisfactory to Regions Bank; (iii) MBI was not to place additional encumbrances on the collateral (which was to be a first-priority security interest in SaltAire property), alter its ownership or management, and so on while the loan was pending; (iv) MBI was to provide a satisfactory opinion letter from its counsel covering various specified topics; and (v) Regions Bank was not required to close in the event of a material adverse change. (Doc. 224, Exh. 52.)[9] By its terms, "[t]his commitment shall be null and void if not closed by February 29, 2008." (*Id.* at 7.)

Upon receipt of Arendall's proposed commitment letter, Jones forwarded it to Gardnyr Michael with a request to "[p]lease check this and let me know if it will pass muster." (*Id.* at 1.) After the underwriter and bond trustee approved the commitment letter and it was signed by Jones and Arendall (doc. 224, Exh. 59), it was forwarded to Allstate on or about February 4,

---

[9]     In a follow-up email to Arendall dated January 31, 2008, Jones asked, "Question: haven't we complied with most items req'd?" (Doc. 224, Exh. 54.) Arendall's one-word response was, "Yes." (*Id.*)

2008. Steve Peterson reviewed the commitment letter on Allstate's behalf.  (Peterson Dep., at 288-89, 295-96, 356-57.)  Although Peterson's recollection was foggy at the time of his deposition, he testified to a "general memory" that his "mental process" as to the commitment letter was, first, to recognize the loan amount sufficed to meet Allstate's requirements; second, to observe that Regions Bank (and not some smaller, lesser known lender lacking a significant local presence) was making the loan; and third, that while the commitment letter reflected that the $2 million loan was being made to MBI (the owner) rather than SDG (the developer), in contrast to Allstate's requirements, this was only a "small issue."  (*Id.* at 358.)  Peterson explained his thought process as follows: "as I thought about it, the $2 million is going into the project, whether it goes to an entity which is closely related to the developer, that, to me, struck – that struck me as – as – not as significant as the $2 million from Regions."  (*Id.* at 358-59.)[10]

On February 5, 2008, Peterson (on behalf of Allstate) signed a letter to the bond trustee reflecting Allstate's determination that the Side Agreement conditions had been satisfied and that the remaining bond proceeds could be released.  (Doc. 224, Exh. 61.)[11]  Peterson approved the commitment letter because it was entirely in line with what he had expected to receive, to-wit: "a fully executed, binding commitment letter from Regions that contained what appeared to be

---

[10]    Plaintiff's evidence is that this rationale was echoed by other participants in this arrangement, none of whom expressed any scruples or concerns that the recipient of the additional $2 million in Regions Bank funding would be the owner, rather than the developer. Gardnyr Michael viewed the commitment letter as satisfying the terms of the Side Agreement for release of bond proceeds.  (Doc. 224, Exh. 53; doc. 225, Exh. 87.)  So did the bond trustee's lawyer.  (Doc. 224, Exh. 56.)  Another of the bond trustee's lawyers explained it this way: "I will agree with you there's an inconsistency .…  But I think the intent was that if there were already fourteen point five million dollars in there, two million dollars more into the ground regardless of whether it was the SaltAire or … Mobile Bay Investments, that that would work."  (Bloom Dep., at 221.)

[11]    The pertinent text of the February 5 letter read as follows:

"This letter is to advise you that the Bondholder has received a fully executed copy of a commitment letter from Regions Bank to provide additional financing to the Saltaire development project for up to two million dollars.  Accordingly, the terms of Section 4 of the Agreement have been met, and the Trustee is authorized to release additional moneys from the Acquisition and Construction Account in excess of one million dollars .…"

(Doc. 224, Exh. 61.)

standard terms and conditions." (Peterson Decl. (doc. 224, Exh. 65), ¶ 8.)[12]  Jones notified
Arendall of this development, with a note that "[h]opefully, we can now move to fully capitalize
MBI and SDG." (Doc. 224, Exh. 62.)  The remaining construction funds (*i.e.*, bond proceeds)
were released by the bond trustee to SDG in short order thereafter.

     Unfortunately for all concerned, Regions Bank never funded the $2 million commitment
specified in the letter to George Jones / MBI dated January 30, 2008.  (Jones Dep. II, at 267.)  By
the plain terms of that commitment letter, Regions Bank's commitment was to become "null and

---

[12]     The Court is aware, of course, that Regions Bank filed a Motion to Strike (doc.
230) directed at Peterson's Declaration, as to which the parties have collectively devoted more
than 35 pages of briefing.  The gravamen of the Motion to Strike is that the Peterson Declaration
runs afoul of the "sham affidavit" rule.  That rule provides that, "[w]hen a party has given clear
answers to unambiguous questions which negate the existence of any genuine issue of material
fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts,
without explanation, previously given clear testimony." *Croom v. Balkwill*, 645 F.3d 1240, 1253
n.18 (11th Cir. 2011) (citation omitted).  The sham affidavit rule "is applied sparingly because of
the harsh effect it may have on a party's case," and applies only where there is an "inherent
inconsistency between an affidavit and a deposition." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d
1224, 1237 (11th Cir. 2010) (citations omitted); *see also McCormick v. City of Fort Lauderdale*,
333 F.3d 1234, 1240 n.7 (11th Cir. 2013) (sham affidavit rule applies only where affidavit "is
directly contradicted by deposition testimony").  The discrepancies or inconsistencies on which
Regions Bank seizes in its Motion to Strike are not "direct" or "inherent;" rather, they depend on
a particular reading and interpretation of particular portions of Peterson's deposition testimony,
to the exclusion of other interpretations of those passages from Peterson's deposition (and also to
the exclusion of other passages that are in tension with, or contrary to, Regions Bank's favored
interpretation).  Via his Declaration, Peterson has attempted to explain and clarify his deposition
testimony (and to highlight additional passages overlooked by Regions Bank) to distance it from
Regions Bank's chosen interpretation of a few selected excerpts taken in isolation.  While a
factfinder need not and might not believe Peterson's proffered clarification and elaboration of the
subject deposition testimony, the sham affidavit rule does not bar such a declaration from being
considered at the summary judgment stage. *See, e.g., Tippens v. Celotex Corp.*, 805 F.2d 949,
953 (11th Cir. 1986) ("A definite distinction must be made between discrepancies which create
transparent shams and discrepancies which create an issue of credibility or go to the weight of
the evidence."); *Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 2995525, *4 & n.9 (S.D.
Ala. Oct. 11, 2007) (sham affidavit rule inapplicable where "all of the plaintiffs' affidavits may
be reasonably viewed as clarifying their deposition testimony, rather than contradicting it," such
that "there is only a *possible* inconsistency, rather than an *inherent* inconsistency between the
affidavits and the prior testimony," which is properly tested at trial and submitted to the jury as
part of its role in determining credibility).  Whatever evidentiary value they may or may not have
at trial, the explanations and clarifications set forth in the Peterson Declaration are not a
complete sham; therefore, the Motion to Strike (doc. 230) is **denied**.

void if not closed by February 29, 2008." (Doc. 206, Exh. 2, at 7.) Neither party's summary judgment briefs point to any witness testimony or documents showing that any explanation (official or unofficial) was ever given for why the $2 million commitment went unfunded. For his part, Jones testified that Arendall never supplied "any reason at all for not funding that two million dollar commitment letter." (Jones Dep. II, at 268.)

Allstate's theory for why the commitment letter was never funded is that it was nothing but a "sham" from its inception. (Doc. 227, at 24.) In addition to previously-described facts, Allstate relies on evidence of the following: (i) Regions Bank requires written or documented internal approval for commitment letters (Burgess Dep., at 247, 251); (ii) Regions Bank has no documentation that Arendall ever obtained such approval for the $2 million SaltAire commitment letter (*id.* at 294-95); (iii) Regions Bank did not even have a copy of the commitment letter or an accompanying credit file in its possession, such that it was unable to produce same in discovery (*id.* at 249-50); (iv) Arendall lacked authority under Regions Bank policy to approve loans in excess of $500,000 (Arendall Dep., at 35-36); (v) although Regions Bank claims that a credit officer named Michele Manry approved the commitment letter (doc. 225, Exh. 71 at # 6-7), Regions Bank has no record of any such approval (doc. 225, Exh. 72 at #10); and (vi) Manry does not recall ever approving (or even seeing) such a commitment letter, and denies ever giving oral approval for same (Manry Dep., at 151-56, 160).

> ### D.     *The Project Fails and Allstate Learns of Its Potential Claims.*

During February 2008, Jones expressed concern to Arendall that either the loan should close in a timely manner or a revised commitment should be prepared because "[w]e had given Allstate a commitment to satisfy a condition in the bond and it was getting ready to expire." (Jones Dep. II, at 245-46.) Neither of those events happened. When the January 30 commitment letter expired on February 29, 2008 without being funded, Jones did not notify Allstate or, apparently, anyone else. (Jones Dep. II, at 264.) For its part, Allstate acknowledges that it never investigated whether Regions Bank had actually funded that commitment or not. (Doc. 206, Exh. 5 at #16.) Nonetheless, Peterson expected that Jones would "immediately" provide notice to Allstate or the bond underwriter if there were a problem in closing the $2 million loan described in the commitment letter. (Peterson Dep., at 311-12.)

Allstate continued to monitor the SaltAire project, and even conducted another site visit in June 2008. (Jones Dep. II, at 263.) During 2009, Allstate became aware that Regions Bank

had withdrawn its loan commitment, that vendors had filed millions of dollars in liens on the project, and that MBI had filed for bankruptcy.  (Rust Dep., at 152-55 & Exh. 331.)

As circumstances at SaltAire continued to spiral downward and SaltAire landowners failed to pay assessments, the District foreclosed on SaltAire property in October 2011 and August 2012.  (Doc. 225, Exhs. 77 & 78.)  The District formed a separate entity, Belle Fontaine Holdco, LLC ("Holdco"), to own, manage and maintain the property for the benefit of the District (and, by extension, Allstate as bondholder).  (Doc. 225, Exh. 80.)  The District assigned to Holdco its rights to credit bid on the property at the foreclosure auctions.  (*Id.*)  Holdco was the high bidder at both auctions.  (Doc. 225, Exhs. 77 & 78.)  The bids made by Holdco were in an amount exceeding the past due assessments plus remaining principal on the bonds, and no cash changed hands.  Nonetheless, Holdco's successful bids at those foreclosure sales did not cancel or pay off Allstate's bonds, which remained outstanding for the full amount.  (Bloom Dep., at 80-81; Anderson Dep., at 73; Quinn Dep., at 163.)  When Holdco ultimately sold the SaltAire property in February 2014, Allstate canceled nearly all of the bonds to accommodate the sale and reduced its damages calculations to offset the limited funds received in connection with those bond redemptions.  (Doc. 225, Exhs. 83 & 84; Anderson Dep., at 97-98; Quinn Dep., at 188.)

Record facts concerning when and how Allstate learned of its claims against Regions Bank and Jones are these:  In late March 2013, Allstate hired counsel "to gather information related to Regions and its investment in the Saltaire project and representations that were made."  (Doc. 225, Exh. 75, at #6.)  According to Allstate, "[a]fter assessment of that information, it was determined that Allstate had been defrauded by Regions."  (*Id.*)  Although the record does not clearly specify what "information" Allstate discovered in March 2013 that led it to believe it had viable fraud claims against these defendants, a plaintiff's witness identified the crucial detail as being the revelation that Regions Bank's agent, Mr. Arendall, lacked authority to commit the bank to the $2 million funding obligation and never received approval for same.  (Doc. 222, Exh. 26, at 87.)  On July 18, 2013, some four months after it hired counsel to investigate Regions Bank's conduct with regard to the SaltAire bonds, Allstate commenced this litigation against Regions Bank, asserting claims of fraudulent misrepresentation, negligent misrepresentation and fraudulent concealment/suppression.  Allstate added Jones as a defendant via First Amended

Complaint (doc. 113) filed on August 21, 2014, and also pleaded a new civil conspiracy cause of action at that time.

## III.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.   Limitations Issue.

All of Allstate's claims against Regions Bank and George Jones are subject to a five-year limitations period under Illinois law.  *See, e.g., Fitton v. Barrington Realty Co.*, 653 N.E.2d 1276, 1278 (Ill.App. 1 Dist. 1995) ("An action in fraud and deceit must be commenced within five years after the cause of action accrued."); *Clark v. Robert W. Baird Co.*, 142 F. Supp.2d 1065, 1074-75 (N.D. Ill. 2001) ("In Illinois, fraud and breach of fiduciary duty are subject to a five-year statute of limitations, measured from the accrual of the cause of action.")[13]  Everyone

---

[13]      Allstate and Regions Bank concur that Illinois law governs the vast majority of the claims and legal issues presented in this lawsuit, including the substantive law for the claims asserted and the applicable limitations period.  However, defendant Jones objects that the Alabama statute of limitations, and not its Illinois counterpart, applies.  (Doc. 211, at 5; doc. 232, (Continued)

agrees that defendants' alleged misrepresentations and suppression of material facts occurred

more than five years before Allstate filed suit.  Indeed, the misstatements concerning Regions

Bank's purported $14.5 million in loans on the SaltAire project were communicated to Allstate

in late 2007 and the purportedly fraudulent commitment letter was issued in February 2008;

however, Allstate did not file suit until July 2013, some five and a half years later.  So if the

limitations period for Allstate's claims were to commence running at the time of the alleged

misrepresentations and fraudulent concealment, then this action would be untimely.

       To forestall that outcome, Allstate invokes the Illinois discovery rule.  Pursuant to that

rule, "[t]he statute of limitations does not begin to run until the wronged person knows or

_____

at 1-2.)  This action was originally filed in the U.S. District Court for the Northern District of Illinois, which transferred it to this District for convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a).  (Doc. 40.)  "It is well established that a transfer under § 1404(a) is generally but a change of courtrooms. … The transferee court is obligated to apply the state law that would have been applied had their been no change of venue."  *James Ventures, L.P. ex rel. Alpert v. Timco Aviation Services, Inc.*, 315 Fed.Appx. 885, 888 (11th Cir. Feb. 27, 2009) (citations and internal quotation marks omitted).  Under Illinois choice-of-law rules, procedural matters (such as statutes of limitation) are governed by Illinois law.  *See, e.g., Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) ("even when the substantive law of a nonforum state applies, Illinois courts apply the Illinois statute of limitations because statutes of limitations are procedural, fixing the time in which the remedy for a wrong may be sought rather than altering substantive rights") (citation and internal quotation marks omitted).  Jones fires back by correctly noting that this rule does not apply to "cases in which the transferor court lacked personal jurisdiction of the defendant."  *James Ventures*, 315 Fed.Appx. at 888 (citation omitted).  Here, however, the transferor court in Illinois made no finding as to whether there was or was not personal jurisdiction over Jones because he had not been named as a defendant at the time of the transfer.  Furthermore, Jones has not presented sufficient facts from which it may be conclusively determined that personal jurisdiction over him would have been lacking in Illinois.  Recall that his alleged fraudulent activities were directed at Allstate (an Illinois-based company with its principal place of business in Cook County, Illinois) and its representative, Steve Peterson (who worked for Allstate in Illinois at all relevant times).  Such predicate facts would appear to support exercise of specific personal jurisdiction over Jones in Illinois.  *See, e.g., Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n.3 (11th Cir. 2006) ("specific jurisdiction is founded on a party's activities in the forum that are related to the cause of action alleged in the complaint").  Because the transferor court did not rule that personal jurisdiction in Illinois is lacking as to Jones and because Jones has failed to make a showing that specific personal jurisdiction could not have been asserted over him in Illinois in this dispute, the undersigned will apply the general rule that, in cases involving § 1404(a) transfers, the transferor court's choice-of-law rules apply.  As such, the limitations issue will be adjudicated pursuant to the Illinois statute of limitations, not its Alabama counterpart.

reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused.  At that point the burden is upon the injured person to inquire further as to the existence of a cause of action." *Halperin v. Halperin*, 750 F.3d 668, 671 (7th Cir. 2014) (citation and internal quotation marks omitted); *see also Fitton*, 653 N.E.2d at 1278 ("According to the discovery rule, … the statute of limitations starts to run when a person knows or reasonably should know that he was injured and that the injury was wrongfully caused.").  "The term 'wrongful cause' refers to the point in time when the injured party becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Solis v. BASF Corp.*, 979 N.E.2d 419, 431 (Ill.App. 1 Dist. 2012) (citation and internal quotation marks omitted).[14]  "[T]he relevant determination rests on what a reasonable person should have known under the circumstances." *Young v. McKiegue*, 708 N.E.2d 493, 501 (Ill.App. 1 Dist. 1999).

  Illinois courts have recognized that "[t]ypically, it is for the trier of fact to decide when the plaintiff knew or reasonably should have known of the injury and when the plaintiff knew or reasonably should have known that the injury was wrongfully caused." *Khan v. BDO Seidman, LLP*, 948 N.E.2d 132, 159 (Ill.App. 4 Dist. 2011); *see also Clark*, 142 F. Supp.2d at 1075 ("Whether a plaintiff should have known of the need for inquiry is an objective determination to be made by the trier of fact.").  "A court may decide this question as a matter of law, however, if the facts are undisputed and only one conclusion could be reasonably drawn from those facts." *Khan*, 948 N.E.2d at 159.  Defendants urge the Court to conclude that this is just such a case.

  Recall that the alleged fraudulent conduct at issue is that Regions Bank issued a "bogus" commitment letter for $2 million and suppressed the fact that it had not previously loaned $14 million for the SaltAire project, all to hoodwink Allstate into believing that the Side Agreement conditions were satisfied so that millions of dollars in bond proceeds could be released to the

---

[14]    *See also Mitsias v. I-Flow Corp.*, 959 N.E.2d 94, 101 (Ill.App. 1 Dist. 2011) ("an injured plaintiff should reasonably know that her injury is wrongfully caused, and the statute of limitations begins to run, as soon as she has sufficient information about her injury and its cause to spark inquiry in a reasonable person as to whether the conduct of the party who caused her injury might be legally actionable"); *Clark*, 142 F. Supp.2d at 1075 ("the discovery rule will not operate to toll the statute of limitations where a plaintiff has enough information about his injury to apprise a reasonable person of the need for further inquiry to determine whether a legal wrong has been committed").

cash-strapped developer.  The critical question for application of the Illinois discovery rule is when Allstate became possessed of sufficient information concerning both the injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct was involved.  In other words, when did Allstate have sufficient information concerning both the alleged fraud and the resulting injury to investigate further?  Allstate says this moment occurred in March 2013, when it first became apprised of suspicious circumstances surrounding the issuance of the commitment letter.  By contrast, Regions Bank pegs that moment to Allstate's receipt of the commitment letter in February 2008.  (Doc. 210, at 41-42.)  But Allstate's evidence is that the bond trustee, the underwriter, and Allstate itself all reviewed the commitment letter and perceived nothing to be amiss, such that they had no inkling that it might have been a fraudulent document describing a non-existent commitment on which Regions Bank never intended to make good.[15]  Perhaps Regions Bank can persuade a jury that any reasonable person reviewing the commitment letter should have seen through its alleged deceptiveness, or at least perceived enough red flags to warrant further investigation as to whether Regions Bank and

---

[15]     Regions Bank argues that the conditions set forth in the commitment letter should have alerted Allstate that perhaps Regions Bank never actually intended to loan the additional $2 million to MBI.  (Doc. 210 at 41-42.)  However, plaintiff's evidence is that the stated conditions were in no way onerous, unusual or unexpected; indeed, correspondence between Jones and Arendall confirms that most or all of them were readily satisfied, apparently without MBI or SDG lifting a finger.  Along the same lines, Regions Bank maintains that the existence of discrepancies between the Side Agreement and the commitment letter should have foreshadowed to Allstate that perhaps defendants were acting fraudulently, but Allstate's evidence is that none of the many actors who reviewed the commitment letter deemed those areas of divergence to be problematic or worrisome.  Regions Bank suggests that Allstate should been placed on alert by the fact that the commitment letter failed to mention a $16 million line of credit; however, there is no evidence that such a commitment letter should or must delineate the broader context of parties' course of dealings, beyond the specific loan in question.  A reasonable finder of fact could deem such an omission from the commitment letter not to be suspicious.  And Regions Bank's position is that, at a minimum, the February 29, 2008 closing deadline in the commitment letter should have caused Allstate to inquire further.  But this argument misses the point.  The mere existence of a funding deadline would not have caused a reasonable person to question whether the commitment letter itself was bogus.  Again, Illinois law does not impose any duty on an injured person to inquire further until he knows or reasonably should know both that he has been injured and that the injury was wrongfully caused.  If (as a reasonable jury could find) Allstate did not have sufficient notice of its injury and its cause as of February 29, 2008, then Illinois's discovery rule would not impose any burden on Allstate to conduct an inquiry at that time as to whether the commitment letter had or had not been funded.

George Jones were attempting to pull the wool over Allstate's eyes.  But that is not the only reasonable conclusion that may be drawn from the record facts; therefore, the question of whether Allstate's claims against defendants are timely under the applicable discovery rule is for the jury to determine at trial.  Summary judgment on that ground is inappropriate.[16]

## V.   Defendants' Other Asserted Grounds for Summary Judgment.

Many of defendants' other grounds for their Motions for Summary Judgment turn on whether Allstate has sufficient evidence to satisfy the elements of claims of fraudulent misrepresentation (Count One), negligent misrepresentation (Count Two) and fraudulent concealment (Count Three).  Before going point-by-point through those asserted bases for relief, a recitation of the legal elements of each cause of action is in order.  "Under Illinois law, the elements of a cause of action for fraudulent misrepresentation are: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance."  *Joseph v. Lowe's Home Centers, LLC*, 2015 WL 2375191, *2 (N.D. Ill. May 14, 2015); *see also Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008).  "Negligent misrepresentation involves the same elements as fraudulent misrepresentation, except that (1) the defendant need not have known that the statement was false, but must merely have been negligent in failing to ascertain the truth of his statement; and (2) the defendant must have owed the plaintiff a duty to provide accurate information."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 573 (7th Cir. 2012) (applying Illinois law).

---

[16]    In his Rule 56 Motion, Jones posits that Allstate had sufficient information concerning the injury and its cause in January 2009, based on an e-mail exchange between Jones and Gardnyr Michael.  There is no evidence that these e-mails were sent to Allstate.  Even if they were, a jury question is presented as to whether the information contained in those e-mails should have placed Allstate on inquiry concerning the alleged fraud, as opposed to Regions Bank's mere failure to fund certain commitments.  Indeed, a reasonable fact finder could conclude that the subject e-mails perpetuated, rather than exposed, the alleged scam.  One such e-mail includes what appears to be a false statement from Jones that, as to the $2 million loan commitment, "Regions funded this a little at a time."  (Doc 211, Exh. C.)  Such a misstatement forecloses the argument that, as a matter of law, Allstate must have known enough as of January 2009 to commence the running of the statute of limitations.

As for fraudulent concealment, the parties agree that a plaintiff asserting such a claim under Illinois law must prove "(1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak …; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection … and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury." *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 816-17 (Ill.App. 1 Dist. 1998) (citation omitted); *see also McMahan v. Deutsche Bank AG*, 938 F. Supp.2d 795, 805 (N.D. Ill. 2013) ("fraudulent concealment requires a plaintiff to allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff") (citations and internal quotation marks omitted).

Under Illinois law, fraud claims must be proven by clear and convincing evidence. *See, e.g., Association Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007) (applying Illinois law and stating, "[m]ost importantly, fraud must be proved by clear and convincing evidence") (citation omitted); *Butler v. Harris*, 13 N.E.3d 380, 387 (Ill.App. 5 Dist. 2014) ("Common law fraud must be proved by clear and convincing evidence."). That "clear and convincing evidence" standard is properly taken into account in the summary judgment analysis. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden").[17]

###### A.    *Absence of Misstatements of Fact.*

As an initial matter, Regions Bank takes aim at Allstate's ability to satisfy the "false statement of material fact" element of both the fraudulent misrepresentation and negligent

---

[17]    *See also Richelieu Foods, Inc. v. New Horizon Warehouse Distribution Center, Inc.*, --- F. Supp.3d ----, 2014 WL 4435823, *8 (N.D. Ill. Sept. 9, 2014) ("Richelieu must prove its fraud claim by clear and convincing evidence, and the Court is to evaluate the evidence presented on summary judgment through the prism of the substantive evidentiary burden.") (citations and internal quotation marks omitted); *Hagen v. Richardson-Merrell, Inc.*, 697 F. Supp. 334, 337 (N.D. Ill. 1988) ("a court on summary judgment applies the same evidentiary standard (i.e. 'clear and convincing' evidence) as would be required at trial in determining whether a genuine issue of fact exists as to a material element of plaintiff's cause of action").

misrepresentation causes of action.  According to the First Amended Complaint, these claims are predicated on the allegation that "Defendants falsely represented, through Regions' January 30, 2008 commitment letter, that Regions was obligated to lend an additional $2 million to MBI, purportedly raising its total commitment to Saltaire to $16.5 million." (Doc. 113, ¶¶ 27, 33.) Allstate's theory is that the commitment letter was a sham because the truth was that neither Regions Bank nor Jones intended for any such $2 million loan to happen and that the letter's sole purpose was to trick Allstate into releasing the bond proceeds.

On summary judgment, Regions Bank takes the position that "[t]he Commitment Letter contains no false statement, and Allstate's claims fail." (Doc. 210, at 17.)  Regions Bank elaborates that the commitment letter could not have falsely represented any obligation to make the loan because, "Regions was obligated *as a matter of law* to make a $2 million loan to the Owner if the conditions in the Commitment Letter had been met."  (*Id.* at 19.)  This argument is unpersuasive on summary judgment.  Again, plaintiff has consistently posited that the commitment letter itself was a fraudulent representation because neither participant (Regions Bank and Jones, as agent of MBI) ever intended for the $2 million loan to occur; rather, they simply issued a phony commitment letter to dupe Allstate into releasing bond proceeds.  Ample summary judgment evidence would allow a finder of fact to conclude by clear and convincing evidence that the commitment identified in the January 30 letter was disingenuous.  For example, in the light most favorable to Allstate, the record reflects that: (i) Arendall (Regions Bank's agent) lacked authority to commit the bank to a $2 million loan, yet he neither sought nor obtained the necessary approvals from anyone at Regions Bank; (ii) Regions Bank did not have the ancillary, supporting paperwork (credit file, etc.) that should have accompanied any legitimate commitment letter; (iii) the SaltAire project was experiencing dire financial difficulties; (iv) Jones and Arendall had been corresponding about a "plan" to ameliorate the project's cash problems, with Jones proposing "if you simply give us a letter stating you are increasing our line by X$, … we can get those $ unleashed," and adding "you wouldn't have to fund until we get everything else done;" and (v) when the February 29, 2008 deadline for funding the $2 million commitment expired without funding, there appears to have been neither

correspondence nor discussion between Arendall and Jones concerning the reasons for the lapse, much less any explanation from anyone as to why the closing never happened.[18]

On this record, taking all record facts and reasonable inferences from same in the light most favorable to Allstate, the Court readily concludes that a reasonable finder of fact could determine by clear and convincing evidence that the January 30, 2008 commitment letter was a sham, a false representation of a nonexistent deal, made for the sole purpose of deceiving Allstate into opening the cash spigot and releasing millions of dollars in bond proceeds to assuage SaltAire's short-term financial crisis.[19]

---

[18]  This last point may benefit from further discussion.  Once again, the commitment letter specified that Regions Bank's commitment to loan $2 million to MBI was to become "null and void if not closed by February 29, 2008," just 25 days after it was signed.  As the deadline approached, there is no indication of any flurry of activity by Arendall and/or Jones to effectuate the closing.  Nor has anyone pointed to record evidence that MBI had failed to satisfy any of the closing conditions documented in the commitment letter; to the contrary, Arendall had represented to Jones from the inception of the letter that all or most of those conditions were already met.  Jones never seems to have asked Arendall why the closing did not happen, and Arendall never seems to have volunteered to Jones any explanation for same.  Taken in the aggregate, these curious omissions and gaps raise a reasonable (and perhaps much stronger) inference that the reason for Arendall's and Jones' silence concerning the closing deadline and the failure to meet it was that neither party to the commitment letter ever meant for the loan to close.  Seen through this light, the evidence would allow a reasonable fact finder to conclude that the commitment letter was nothing but "a letter stating [Regions Bank was] increasing [MBI's] line by X$" for the purpose of "get[ting] those $ unleashed," with no intent by the signatories to follow through.

[19]  In so concluding, the Court rejects Regions Bank's hypertechnical summary judgment argument that the commitment letter could not have been fraudulent because, as a legal matter, it actually, formally obligated Regions Bank to loan the money to MBI if and when the attendant conditions spelled out in the letter were satisfied.  The heart of Allstate's claim is that, regardless of what legal, contractual effect the commitment letter had, the transaction it documented was entirely fictional because, with a wink and a nod, Arendall and Jones had executed the letter with an unwritten understanding that the loan would never actually come to be.  Under this theory, it did not matter whether the agreement was enforceable by Regions Bank or MBI, because the agents of each were operating under a secret arrangement that would preclude such enforcement never taking place.  Sufficient summary judgment evidence allows Allstate to reach a jury on this theory, notwithstanding Regions Bank's protestations about how the commitment letter would have been legally enforceable had it been an arm's-length, legitimate transaction.  That is precisely the point:  Allstate's evidence is that it was not an arm's length, legitimate transaction, but was rather an instrument of deception targeting Allstate.

### B.   *Duty of Disclosure.*

With regard to the fraudulent concealment / suppression cause of action found at Count Three of the First Amended Complaint, the claim is that defendants knew that Allstate mistakenly believed that Regions Bank had previously funded a $14.5 million loan to SaltAire, but concealed the truth from Allstate that no such loan existed.  Plaintiff's theory is that "[t]he Defendants allowed Allstate to believe this so that the Defendants could convince Allstate that the January 30, 2008 commitment letter increased Regions' financial commitment to Saltaire to more than $16 million," thereby inducing Allstate to release the bond proceeds under false pretenses.  (Doc. 113, ¶ 42.)

Regions Bank moves for summary judgment on Count Three based on the duty element. As a matter of well-settled Illinois law, "a claim of fraudulent concealment or fraud-by-nondisclosure … requires a duty to disclose on the part of a defendant."  *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 (7th Cir. 2009).  Ordinarily, "[t]here is no duty to speak absent a fiduciary or other legal relationship between the parties."  *Neptuno*, 692 N.E.2d at 817; *see also Phillips v. DePaul University*, 19 N.E.3d 1019, 1038 (Ill.App. 1 Dist. 2014) ("To assert a claim for fraudulent concealment, plaintiffs must establish the existence of a special or fiduciary relationship, which in turn gives rise to a duty to speak.").  "A duty to disclose a fact may arise out of several situations, including fiduciary or confidential relationships, or a situation in which a plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff."  *McMahan*, 938 F. Supp.2d at 805.

Regions Bank's argument is straightforward:  There could not have been a fiduciary or other legal relationship between Allstate and Regions Bank as to the SaltAire project because there was no relationship or direct interaction between them.  So, Regions Bank reasons, it owed no duty to correct Allstate's mistaken understanding about the nonexistent $14.5 million acquisition and development loan or line of credit from Regions Bank.  In response, Allstate does not suggest that it had any fiduciary, special or confidential relationship with Regions Bank on the SaltAire project.[20]  Instead, Allstate relies on Illinois authorities supporting the existence

---

[20]     To be sure, Allstate does show that it has been a Regions Bank commercial banking customer since 1997.  (Doc. 227, at 35.)  This fact is legally irrelevant as it pertains to the duty to disclose element of Count Three; indeed, Allstate fails to articulate any principle by (Continued)

of a duty to speak in circumstances where "the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension," and in circumstances where "silence accompanied by deceptive conduct or suppression of a material fact can give rise to concealment and the party which has concealed information is then under a duty to speak." *Merix Pharmaceutical Corp. v. Clinical Supplies Management, Inc.*, 2012 WL 1577676, *10 (N.D. Ill. May 4, 2012) (citations omitted). Allstate's position is that both of these types of circumstances (*i.e.*, Regions Bank contributing to Allstate's misapprehension of a material fact then failing to correct same, and Regions Bank being silent while engaging in deceptive conduct) are adequately supported by the record. Regions Bank does not contest the point, as a factual matter, for summary judgment purposes, nor could it do so persuasively given the genuine issues of material fact in the record.

Instead, Regions Bank maintains that the Illinois legal mechanisms creating a duty to disclose as enunciated in *Merix Pharmaceutical* are unavailable because they are constrained by "the fundamental principle that Illinois law does not impose any duty when the parties have no direct contact concerning the transaction at issue." (Doc. 231, at 6.)  In other words, Regions Bank stakes its "no duty" argument as to Count Three on the premise that Illinois requires "direct contact" between the parties as an absolute, essential prerequisite to any duty to speak in the fraudulent concealment context.  In support of such a "direct contact" rule, Regions Bank relies heavily on *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812 (Ill.App. 1 Dist. 1998).  However, the phrase "direct contact" appears nowhere in the *Neptuno* opinion.  Furthermore, a plain reading of the relevant portion of that decision reveals that the *Neptuno* panel was focused exclusively on the "special or fiduciary relationship" means of establishing a duty to speak.  *See id.* at 817-18.  Nowhere did *Neptuno* address, much less impose limitations or caveats on, a plaintiff's ability to establish a duty to speak for fraudulent concealment purposes in situations where (i) a defendant's acts contribute to plaintiff's misapprehension of a material fact and defendant fails to correct it or (ii) the defendant's silence is accompanied by deceptive conduct.  Accordingly, the Court does not read *Neptuno* or any

which that banking relationship might give rise to a duty to disclose under Illinois law in the circumstances presented here.

other case cited by Regions Bank as establishing a "direct contact" legal prerequisite for assertion of a fraudulent concealment claim under Illinois law.  The Court will not unilaterally engraft such a requirement onto Illinois law without any indication that Illinois courts have done (or would do) so.[21]

In sum, Allstate's fraudulent concealment claim relies on a strand of Illinois law imposing a duty of disclosure on a defendant who either contributes to a plaintiff's misapprehension of a material fact or engages in silence accompanied by deceptive conduct. Regions Bank has not shown that Allstate's recitation of Illinois law is incorrect in this regard, that Illinois courts have overruled or materially circumscribed those principles, or that plaintiff's summary judgment evidence would not support a finding of a duty to disclose under either the "actions contributing to misapprehension" or "silence accompanied by deceptive conduct" alternatives.  Accordingly, defendant's argument for dismissal of Count Three based on the absence of any duty to speak is unavailing on summary judgment.

### C.    *Justifiable Reliance.*

Under Illinois law, a common element shared by claims of fraudulent misrepresentation, negligent misrepresentation and fraudulent concealment is justifiable reliance.  *See, e.g., Simmons v. Campion*, 991 N.E.2d 924, 932 (Ill.App. 3 Dist. 2013) ("[N]o recovery for fraudulent misrepresentation, fraudulent concealment or negligent misrepresentation is possible unless plaintiffs can prove justifiable reliance, *i.e.*, that any reliance was reasonable.") (citations omitted); *Schrager v. North Community Bank*, 767 N.E.2d 376, 386 (Ill.App. 1 Dist. 2002) ("Failure to prove justifiable reliance is fatal to claims of fraudulent misrepresentation, negligent

---

[21]    It is no answer to argue, as Regions Bank does, that "Allstate has failed to present a single case in which an Illinois court … has imposed a duty of disclosure on a party that had no contact with the plaintiff about the transaction at issue."  (Doc. 231, at 8.)  Regions Bank, the Rule 56 movant, has failed to present a single case in which an Illinois court has held or even suggested that "direct contact" or lack thereof is central to the duty to speak element of a fraudulent concealment claim based on a defendant's acts contributing to a plaintiff's misapprehension or its silence accompanied by deceptive conduct.  Regions Bank writes that "this Court should not be the first to hold that Illinois law imposes a duty of disclosure when no relevant relationship exists" (doc. 231, at 8), yet it asks this Court to be the first to hold that Illinois law never imposes a duty of disclosure in the absence of direct contact between plaintiff and defendant.  The Court declines to do so.  At any rate, cases like *Merix Pharmaceutical* and the authorities cited therein suggest that Illinois courts do not focus exclusively on the relationship between a plaintiff and a defendant in determining whether a duty to disclose exists.

misrepresentation and fraudulent concealment of material fact."). On summary judgment, Regions Bank contends that all of Allstate's claims must be dismissed for failure to make an adequate showing of reliance.[22]

### 1.   Illinois Legal Standard for Justifiable Reliance.

Under Illinois law, the issue of whether a plaintiff's reliance on a purportedly false representation is justified must be evaluated by reference to the totality of the circumstances. *See, e.g., Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 9 (Ill.App. 1 Dist. 2001) ("The right to rely depends on consideration of all the surrounding circumstances.").[23] Thus, "[t]o determine whether reliance was justified, the court considers the facts the party knew and those facts which it could have learned through ordinary prudence." *JPMorgan Chase Bank, N.A. v. East-West Logistics, L.L.C.*, 9 N.E.3d 104, 121 (Ill.App. 1 Dist. 2014). "[A] person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Siegel Development, LLC v. Peak Const. LLC*, 993 N.E.2d 1041, 1060 (Ill.App. 1 Dist. 2013) (citation omitted); *see also Sain v. Nagel*, 997 F. Supp. 1002 (N.D. Ill. 1998) ("The victim of fraud need not dig beneath apparently adequate assurances, but he has

---

[22]    Illinois courts have opined that, as a general rule, "justifiable reliance is a question of fact that is to be determined by the finder of fact and not … by the trial court as a matter of law." *Schrager*, 767 N.E.2d at 386 (citation and internal marks omitted). "Although reliance is normally a question of fact, it can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (applying Illinois law); *see also Siegel Development, LLC v. Peak Const. LLC*, 993 N.E.2d 1041, 1060 (Ill.App. 1 Dist. 2013) ("Generally, the question of whether a plaintiff's reliance was reasonable is a question of fact; however, where only one conclusion can be drawn from the undisputed facts, the question becomes one for the court to determine."). Thus, in evaluating Regions Bank's Rule 56 Motion on the reliance issue, the Court recognizes that relief may be granted only if either (i) no fact finder could deem it reasonable for Allstate to have relied on the alleged misrepresentations at issue, or (ii) only one conclusion can be drawn from the undisputed facts.

[23]    *See also Triumph Packaging Group v. Ward*, 877 F. Supp.2d 629, 647 (N.D. Ill. 2012) ("In determining reasonableness, Illinois law directs courts to ask whether the plaintiff had a right to rely on the statement in light of the surrounding facts."); *Sain v. Nagel*, 997 F. Supp. 1002, 1014-15 (N.D. Ill. 1998) ("To decide whether a person justifiably relied on material omissions or misrepresentations, courts look to all of the circumstances surrounding the transaction, including the parties' relative knowledge of available facts, the opportunity to investigate the facts, and prior business experience.").

two duties of care: (1) he cannot close his eyes to a known risk and (2) he cannot close his eyes to a risk that is obvious.").

Notwithstanding the foregoing, "Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another." *Siegel*, 993 N.E.2d at 1060-61 (citations omitted); *see also Hassan v. Yusuf*, 944 N.E.2d 895, 916 (Ill.App. 1 Dist. 2011) ("it is well established that in the absence of circumstances putting a reasonable person on inquiry, that person is justified in relying on a representation without engaging in further inquiry, especially where the misrepresentation concerns matters which may be assumed to be within the knowledge of the party making them"); *Richelieu Foods, Inc. v. New Horizon Warehouse Distribution Center, Inc.*, --- F. Supp.3d ----, 2014 WL 4435823, *8 (N.D. Ill. Sept. 9, 2014) (even though plaintiff had the ability to discover fraudulent nature of defendant's conduct, "this is not the end of the road for Richelieu's fraud claim, for it need not have conducted any investigation if the alleged misrepresentations were presumptively within New Horizon's knowledge and contained nothing so improbable as to cause Richelieu to doubt their truth").

> 2.     *Justifiable Reliance and the Commitment Letter.*

With regard to the January 30, 2008 commitment letter that lies at the heart of the intentional and negligent misrepresentation claims set forth at Counts One and Two, Regions Bank maintains that Allstate cannot satisfy the justifiable reliance element, as a matter of law.  In particular, Regions Bank reasons that the face of the commitment letter should have alerted Allstate that there was no unconditional obligation to fund the $2 million loan, that the commitment letter's provision requiring a first mortgage (which Regions Bank did not have) should have been a red flag that the transaction was impossible, that Allstate could have investigated the matter by waiting to see if the $2 million loan referenced in the commitment letter actually materialized before relying on the letter and releasing the bond proceeds, and that

Allstate could not have relied on the commitment letter (confined to a $2 million loan commitment to MBI) as evidence that Regions Bank had loaned $16.5 million to SDG.[24]

The fundamental weakness with these arguments as they relate to a Rule 56 analysis is that each depends on a selective reading of the record evidence and/or a drawing of inferences most favorable to the movant.  For example, Regions Bank seizes on the deposition testimony of Allstate witness Steve Peterson that he was looking for "[a] binding commitment … equivalent to actual funding."  (Peterson Dep., at 264.)  Based on that phrase, Regions Bank posits that Allstate could not have justifiably relied on the commitment letter as being "equivalent to actual funding" of a $2 million loan because the commitment letter was laden with conditions precedent to funding.  This argument cannot carry the day on summary judgment because it isolates particular excerpts of Peterson's testimony to the exclusion of others (and discounts his subsequent clarifying declaration) showing that Allstate did not demand an unconditional, absolute funding obligation from Regions Bank in order to release the bond proceeds.[25]  Along

---

[24]     Regions Bank also makes much of a line of authorities spearheaded by *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053 (7th Cir. 1988), which it contends "dictates that reliance on a commitment letter as the equivalent of a loan is unreasonable as a matter of law."  (Doc. 210, at 25-26.)  Contrary to Regions Bank's arguments, *Runnemede* does not mandate any particular outcome in this case.  In *Runnemede*, the defendant issued a commitment letter to the plaintiff, setting forth various conditions precedent to issuing the loan.  Contemporaneously, the defendant's chairman reassured the plaintiff, "We have a deal." *Runnemede*, 861 F.2d at 1055.  The defendant subsequently withdrew from the loan commitment, prompting the plaintiff to sue on the ground that the "we have a deal" assurances were fraudulent.  Applying Illinois law, the Seventh Circuit concluded that the plaintiff "did not act with reasonable prudence in relying on" those assurances, given their divergence from the terms of the commitment letter.  No reasonable analogy may be drawn between *Runnemede* and this case.  Unlike the *Runnemede* plaintiff, Allstate is not claiming that Regions Bank provided oral assurances that contradicted the terms of the written commitment letter.  Unlike the *Runnemede* plaintiff, Allstate's fraud claims are not predicated on the notion that the conditions precedent in the commitment letter should be ignored, erased or superseded based on assurances given afterwards.  While Regions Bank latches onto certain *dicta* in *Runnemede* expressing in general terms the meaning and legal import of commitment letters, that description does not necessarily apply to the specific form of commitment letter presented here and, even if it did, would not destroy Allstate's ability to engage in justifiable reliance on such commitment letter, as a matter of law.

[25]     Indeed, in the very same breath that Peterson testified to his desire for Regions Bank to provide a commitment "equivalent to actual funding," he said, "with the only difference being a timing or maybe a documentation issue."  (Peterson Dep., at 264.)  A reasonable reading (Continued)

the same lines, Regions Bank's arguments concerning the first mortgage and the identity of the payee of the loan (*i.e.*, the commitment letter provided that the borrower was to be the owner, not the developer, as Allstate had required) all point to factual issues properly resolved at trial, rather than uncontroverted facts unequivocally demonstrating that Allstate's reliance on the January 30 commitment letter was unreasonable and unjustified as a matter of law.[26]

of the conditions precedent in the January 30, 2008 commitment letter is that the conditions precedent imposed therein are akin to "a timing or maybe a documentation issue." Likewise, in his declaration, Peterson avers that Allstate always understood and expected any Regions Bank commitment letter to contain standard terms and conditions (as is *de rigueur* for such letters). (Peterson Decl., ¶¶ 4-8.) Such recognition is just what one would expect from a sophisticated bond market participant like Allstate. It is ultimately for the finder of fact – and not this Court on summary judgment – to determine whether Allstate really expected a commitment letter with no terms or conditions of any kind (in which case it would have been unjustified and foolhardy for Allstate to rely on the January 30 letter) or whether the inclusion of the terms and conditions of the sort set forth in the January 30 commitment letter was in fact consistent with Allstate's expectations and requirements all along.

[26]     As to the first mortgage issue, Regions Bank says Allstate should not have relied on the commitment letter because it contained a clause providing that "[t]he loan shall be secured by a first priority security interest or mortgage on all tangible and intangible property related to the Project." (Doc. 206, Exh. 2 at 2.) Regions Bank posits that Allstate knew Regions Bank did not have such a first priority security interest, and that it therefore should have realized that the commitment letter was never going to bear fruit because it contained an unattainable condition precedent. However, there appear to be disputed issues of material fact as to whether Allstate did or did not know the precise status of Regions Bank's mortgage interest on the SaltAire property. Regions Bank identifies no evidence from which a finder of fact must conclude that it would have been unreasonable for Allstate to believe that Regions Bank either possessed or was capable of acquiring the requisite first-place mortgage. Plaintiff's evidence is that Allstate believed precisely that. (Peterson Dep., at 300, 304, 313.) On this record, it is not evident that any reasonably attentive party in Allstate's position would necessarily have had to conclude that Regions Bank was incapable of obtaining a first-position mortgage and that the commitment letter was therefore a mirage because the contemplated loan would never happen. Stated differently, the "first priority security interest" language did not render it unreasonable, as a matter of law, for Allstate to rely on the commitment letter as a genuine document reflecting a genuine commitment by Regions Bank to lend $2 million to the SaltAire project. With respect to the owner-versus-developer issue, Regions Bank says that it was unreasonable, as a matter of law, for Allstate to rely on the commitment letter (reflecting a $2 million loan ***to MBI***) when Allstate's demand had always been that Regions Bank loan $16.5 million ***to SDG*** (the developer, not the owner). Plaintiff's evidence (including both excerpts from Peterson's deposition itself, and the clarifying Peterson Declaration) offers a plausible, reasonable explanation for why the developer-versus-owner distinction on which Regions Bank now seizes was simply not of (Continued)

Abstracting away from the back-and-forth minutiae of the parties' summary judgment briefs, the justifiable reliance question is actually quite straightforward for purposes of resolving the Rule 56 Motions as to the misrepresentation causes of action. Once again, Allstate's theory in Counts One and Two is that Regions Bank issued a commitment letter that neither it nor its alleged co-conspirator (George Jones) ever intended to honor, all for the purpose of deceiving Allstate into releasing the bond proceeds. On its face, the commitment letter appeared to be valid and above-board in all respects. It was presented on Regions Bank letterhead,[27] signed by Arendall in his official capacity as "Vice President, Commercial Real Estate." Jones had executed it as "Authorized Representative" of MBI. Before receiving Allstate's endorsement, the letter had been reviewed and approved by a gauntlet of sophisticated industry professionals, including the bond trustee, the underwriter, and a small army of lawyers representing a host of constituencies. Not one of them raised a red flag as to the letter's legitimacy or identified a whiff of artifice therein. Given these circumstances, why wouldn't Allstate have relied on that document? Regions Bank's emphatic contention that it was unreasonable of Allstate to place any stock in the letter is for the jury, not the Court, to decide.

To frame it in legal terms, Illinois law allows a plaintiff to rely on a representation *without investigation* when such representation "is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth." *Siegel*, 993 N.E.2d at 1060. On this record, a reasonable finder of fact could determine that the January 30 commitment letter was made as to facts actually within the knowledge of Regions Bank and Jones, and that it contained nothing so improbable as to cause doubts that it

---

paramount importance to Allstate. Regions Bank is free to argue to the finder of fact at trial that such an explanation is invalid, dishonest and/or a convenient, lawyer-generated *post hoc* rationalization; however, the Court cannot and does not find it to be so as a matter of law at the summary judgment stage.

[27]    Plaintiff's evidence is that the identity of the bank being Regions Bank was significant in the reliance calculus too, given that "it's a large sophisticated bank" with "a local presence in Mobile." (Peterson Dep., at 347.) That the bank making the representation in question was a large, well-established financial services firm with roots in that very community merely adds to the reasonableness of Allstate's decision to rely on the commitment letter as a *bona fide* statement of agreement, rather than rejecting it as an instrument of deception.

was, in truth, a sham.  Therefore, a finder of fact applying Illinois law could reasonably find that Allstate was justified in relying on the commitment letter as documenting a legitimate, *bona fide* agreement between Regions and MBI (rather than a sham designed to dupe Allstate), and that Allstate was not required to perform any research or investigation antecedent to such reliance.[28]

3.    *Justifiable Reliance and Regions Bank's Silence about the $14.5 Million.*

With regard to the fraudulent concealment claim alleged in Count Three of the First Amended Complaint, Regions Bank maintains that summary judgment is appropriate because Illinois law imposes a heightened reliance requirement.  Allstate flatly denies that reliance should be evaluated any differently the context of fraudulent concealment claims.

Regions Bank has the upper hand on this question.  In case after case, Illinois courts have identified the elements of fraudulent concealment as including a requirement of proof that "***the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection,*** and justifiably relied upon the defendant's silence as a representation that the fact did not exist."  *Phillips*, 19 N.E.3d at 1037 (emphasis added); *see also Holzrichter v. Yorath*, 987 N.E.2d 1, 25 (Ill.App. 1 Dist. 2013) (same); *Doe v. Brouillete*, 906 N.E.2d 105, 123 (Ill.App. 1 Dist. 2009) (same); *Neptuno*, 692 N.E.2d at 816 (same); *Cement-Lock v. Gas Technology Institute*, 618 F. Supp.2d 856, 883 (N.D.

---

[28]    One point of clarification may be helpful.  At various intervals, Regions Bank frames Counts One and Two as an attempt to hold it liable for a misrepresentation that Regions Bank had committed $16.5 million to the SaltAire project, but that "Allstate cannot claim reliance on an alleged misrepresentation that Regions did not make."  (Doc. 231, at 11.)  This is not a fair characterization of the operative pleading.  Counts One and Two do not claim that Regions Bank ever made an affirmative misrepresentation that it had committed $16.5 million to SaltAire; rather, they allege that Regions Bank misrepresented that the January 30 commitment letter reflected a genuine commitment to lend $2 million to the project.  As alleged in the First Amended Complaint, the object of that misrepresentation was to deceive Allstate (exploiting what defendants knew was Allstate's mistaken understanding that Regions Bank already had $14.5 million in the project) into thinking that Regions Bank had committed a total of $16.5 million to SaltAire so that Allstate would release the bond proceeds; however, the actual misrepresentation was the $2 million commitment.  Counts One and Two do not charge Regions Bank with making a direct misrepresentation about $16.5 million, *per se*.  Any attempt via the Motions for Summary Judgment or trial argument to recast those counts as alleging a direct misrepresentation about a $16.5 million commitment is inaccurate and misleading.

Ill. 2009) (same).[29]  Contrary to Allstate's argument, Illinois law is clear that a plaintiff alleging fraudulent concealment must prove, in addition to the same justifiable reliance element governing other kinds of fraud, that the plaintiff either (i) could not have discovered the truth through reasonable inquiry, or (ii) was prevented from making a reasonable inquiry.[30]

As pleaded in the First Amended Complaint, the alleged fraudulent concealment was that "[t]he Defendants concealed from Allstate that Regions had not funded a $14.5 million acquisition and development loan or line of credit to Saltaire in December of 2007." (Doc. 113, ¶ 39.)  Thus, the relevant question for purposes of this summary judgment challenge is whether Allstate either (i) could not have discovered the truth about the non-existence of any such $14.5 million loan from Regions Bank to Saltaire in December 2007 upon reasonable inquiry, or (ii) was prevented from making such an inquiry.  There are no facts or allegations that Regions Bank, Jones or anyone else prevented Allstate from making any financing inquiries that it wished; therefore, Count Three stands or falls on whether a reasonable finder of fact could conclude on this record that Allstate "could not have discovered the truth through a reasonable inquiry or inspection."

Undisputed evidence demonstrates that it would have been a relatively simple matter for Allstate to determine the extent of Regions Bank's financial commitment to the SaltAire project as of December 2007.  As underwriter for the bond issue, Gardnyr Michael was available at Allstate's discretion to obtain any project-related information or documentation it might have requested.  (Hunt Dep., at 286.)[31]  Warren Bloom, counsel for the bond trustee, testified that "it

---

[29]     For confirmation that this highlighted text is, in fact, a required element of a fraudulent concealment claim under Illinois law, one need look no further than Allstate's memorandum of law.  (*See* doc. 227, at 30 (reciting "could not have discovered the truth" / "prevented from making a reasonable inquiry" standard as an element of a fraudulent concealment claim in Illinois)).

[30]     Perhaps a semantics-based argument could be made that the reliance test is actually identical in misrepresentation and concealment cases, but that plaintiffs must prove inability to discover the truth *in addition to* reliance in the latter context.  Either way, the result is the same: In Illinois, fraudulent concealment requires an additional reliance-related showing above and beyond that which is needed as to other kinds of misrepresentation claims.

[31]     What's more, Gardnyr Michael possessed the necessary clout to obtain copies of documentation from MBI and SDG that would have revealed the true state of Regions Bank's financing of the project.  Had Allstate requested that information and MBI/SDG declined to (Continued)

was confirmable" whether SDG had a $14.5 million line of credit with Regions Bank.  (Bloom I Dep., at 232.)  Bloom further acknowledged that he "could also have easily put a requirement for confirmation in the side agreement."  (*Id.*)  And Bloom asserted that Allstate or Gardnyr Michael could have required SDG to provide copies of notes and mortgages for SaltAire, which information would have been "[e]asy to request."  (*Id.* at 233.)  Allstate rebuts none of this testimony.  Nor does Allstate suggest that it would have been unreasonable or extraordinary under the circumstances to make such an inquiry.  The only record evidence, then, is that Allstate could have ascertained the true status of Regions Bank's financing of SDG and the SaltAire project upon a reasonable inquiry.  That showing is fatal to Allstate's ability to maintain a fraudulent concealment cause of action under Illinois law predicated on defendants' alleged concealment of the fact "that Regions had not funded a $14.5 million acquisition and development loan or line of credit to Saltaire in December of 2007."

In opposition to Regions Bank's Motion for Summary Judgment on this point, Allstate interposes three counterarguments.  First, Allstate insists that it did "conduct a reasonable investigation concerning the $14.5 million by relying on the collective disclosure documents." (Doc. 227, at 49.)  This argument misstates the applicable legal standard.  Again, Illinois law is unmistakably clear that, in the absence of proof that a plaintiff was prevented from making reasonable inquiry (which is not applicable here), a party bringing a fraudulent concealment claim must show that "the innocent party could not have discovered the truth through a reasonable inquiry or inspection."  *Neptuno*, 692 N.E.2d at 816.  The operative question is not whether plaintiff's actual inquiry was successful, but whether plaintiff could have engaged in a reasonable inquiry that would have revealed the truth.  The unambiguous record evidence is that, if Allstate had simply asked Gardnyr Michael or SDG, it could have obtained the mortgages and notes that would have revealed the true state of Regions Bank's financial commitment to the project, which was far less than the $14.5 million that Allstate understood it to be.  No reasonable finder of fact could conclude that such an inquiry would have been unreasonable,

---

supply it, Gardnyr Michael could and would have pulled the plug on the entire bond deal.  (*Id.* at 287-89.)

extraordinary, or beyond the pale of what was reasonably available to Allstate.  Again, Allstate does not argue that it would have been unreasonable to make such a request.[32]

Second, Allstate suggests that such an inquiry would have been futile because the underwriter "believed that Regions had already loaned $14.5 million to the Developer-SDG." (Doc. 227, at 49 n.63.)  To be sure, record evidence supports plaintiff's assertion that Jones repeatedly informed Gardnyr Michael that Regions Bank had loaned $14.5 million on the project.  (Doc. 222, Exh. 31; Hunt, Dep., at 218.)  But this evidence answers the wrong question. The "reasonable inquiry" contemplated by Regions Bank's Rule 56 Motion is not that Allstate call Gardnyr Michael and ask, "How much does Regions Bank have in SaltAire?"  Rather, the inquiry Regions Bank says could and should have been made was for Allstate to request copies of notes and mortgages that would have confirmed the total amount of Regions Bank's financial commitment to the project.  That eminently reasonable, achievable inquiry would in no way have been defeated or frustrated by Gardnyr Michael's mistaken understanding about the amount of Regions Bank's loan commitment to SaltAire.

Third, Allstate suggests that additional inquiry would not have revealed the fraud because "Jones had directly lied to Allstate about Regions [*sic*] underlying financial commitment."  (Doc. 227, at 49 n.63.)  The evidence on which Allstate relies for this proposition is an e-mail chain from January 8, 2009, more than 11 months <u>after</u> Allstate had released the bond proceeds.

---

[32]	In a footnote, Allstate provides a string cite to authorities from multiple jurisdictions for the proposition that "Allstate was entitled to rely as a matter of law on the disclosure documents from the underwriter."  (Doc. 227, at 47-48 n.60.)  These cases say nothing about the Illinois law of fraudulent concealment.  They do not say that Illinois law excuses a fraudulent-concealment plaintiff from proving that it could not have discovered the truth upon reasonable inquiry as long as it read disclosure documents provided by an underwriter.  They certainly do not establish that a plaintiff satisfies this element of a fraudulent concealment claim against a third-party lender as a matter of law as long as it reviewed disclosure documents prepared by an underwriter.  In short, this line of authorities does not appear to have any meaningful bearing on a plaintiff's burden in a fraudulent concealment claim brought under Illinois law against a lender (not an underwriter).  The operative question under Illinois law is whether Allstate "could not have discovered the truth through a reasonable inquiry or inspection."  That federal securities laws would allow it to rely on an underwriter's disclosure documents does not automatically mean that Allstate has satisfied this element, when all evidence before the Court is that there was a reasonable inquiry Allstate could have made but did not make (*i.e.*, asking to see the Regions Bank loan documents for SaltAire) that would have revealed the truth as to the concealed facts.

Apparently, then, Allstate's argument is that it would have no good to ask Jones how much Regions had loaned because Jones later showed himself to be dishonest. Again, this argument and evidence has no bearing on the reasonable inquiry proposed by Regions Bank on summary judgment. Regions Bank does not contend that Allstate could have discovered the truth by making a telephone call to Jones. Whether Jones would or would not have been candid if Allstate had reached out to him in December 2007, which is entirely conjectural at this point, tells us nothing about whether Allstate could have discovered the truth upon reasonable inquiry to Gardnyr Michael to obtain documentation confirming the total amount of Regions Bank's loan commitments.

When all is said and done, the reasoning and result are clear. In Count Three, Allstate accuses Regions Bank and Jones of fraudulently concealing the fact that Regions Bank had not funded a $14.5 million loan or line of credit for SaltAire. To prevail on such a claim under Illinois law in these circumstances, Allstate must prove that it "could not have discovered the truth through a reasonable inquiry or inspection." But uncontroverted evidence in the summary judgment record shows that reasonable inquiry could have uncovered the truth if Allstate had simply asked the underwriter to obtain copies of Regions Bank's notes and mortgages on the project to confirm its total financial commitment. Allstate has no effective rebuttal to this argument. It has not shown that such an inquiry would have failed. It has not shown that such an inquiry would have been burdensome or unreasonable. Instead, it proffers red herrings about federal securities law's treatment of underwriter documents, potential misunderstandings of the underwriter, and subsequent alleged falsehoods by Jones. None of those collateral matters alter the fundamental, inescapable truth that if Allstate had simply asked, it could have obtained documentation confirming the nature and extent of Regions Bank's financial involvement in SaltAire. Those materials would have shown that Regions Bank had loaned far less than $14.5 million to the project, thereby revealing the truth about the allegedly fraudulently concealed fact. Accordingly, this record admits of only one conclusion, to-wit: Allstate could have discovered the truth about the concealed material fact through a reasonable inquiry. That determination bars plaintiff's fraudulent concealment cause of action under Illinois law, and requires that summary judgment be **granted** to defendants as to Count Three.

### D.   *Loss Causation.*

Next, Regions Bank seeks dismissal of Allstate's fraud claims for failure to prove loss causation under Illinois law.  Although Allstate debates the point, Regions Bank is correct that the concept of "loss causation" is applicable here.  Under Illinois law, "[a] legal remedy, whether rescission or damages, does not follow automatically from the existence of a false statement or material omission.  There must be reliance, which is often called transaction causation, and injury, which is often called loss causation."  *Leibowitz v. Great American Group, Inc.*, 559 F.3d 644, 648 (7th Cir. 2009) (noting that this concept arises under federal securities law, but observing that "Illinois and most other states also follow this approach").[33]  The concept of "loss causation" captures the principle that "[t]he plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss."  *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 747 (Ill. 1994) (citation omitted).  It has been held that "loss causation was simply another name for the common law fraud rule of proximate cause."  *Bastian v. Petren Resources Corp.*, 648 N.E.2d 165, 168 (Ill.App. 1 Dist. 1995) (citation and internal quotation marks omitted).  The appropriate question for the loss causation / proximate cause inquiry is as follows: "Would the decline in plaintiff's investment have occurred even if defendant's misrepresentation had been true?"  *Martin,* 643 N.E.2d at 748 (citation omitted).  An affirmative response indicates that "plaintiff has failed to prove that the misrepresentation proximately caused the decline."  *Id.* (citation omitted).  Regions Bank moves for summary judgment on the ground that Allstate has failed to establish the necessary loss causation.

In response, Allstate argues that the Motion for Summary Judgment is due to be denied as to this ground because Regions Bank has not satisfied its threshold burden.  Specifically, Allstate

---

[33]     *See also Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) ("What securities lawyers call loss causation is the standard common law fraud rule merely borrowed for use in federal securities fraud cases.") (citation and internal marks omitted); *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 763 (7th Cir. 1998) (applying Illinois law and concluding that "[t]he requirement of proving loss causation is a general requirement of tort law"); *Maxwell v. KPMG, LLP*, 2007 WL 2091184, * (N.D. Ill. July 19, 2007) ("Under Illinois law, a finding of 'but for' causation (what philosophers call a 'necessary condition') is not a sufficient basis for imposing legal liability. … Plaintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved.") (citations and internal marks omitted).

cites Seventh Circuit authorities for the proposition that, in order to obtain summary judgment on grounds of failure to prove loss causation, the movant must establish that "as a matter of undisputed fact, the depreciation in the value of the notes could not have resulted from the alleged false statement or omission of the defendant." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649-50 (7th Cir. 1997). "It is only upon such a showing that [nonmovants] must introduce evidence of loss causation sufficient to establish a genuine dispute as to the same." *Silverman v. Motorola, Inc.*, 798 F. Supp.2d 954 (N.D. Ill. 2011).

Allstate's position, quite simply, is that Regions Bank's Rule 56 Motion relating to loss causation is meritless because Regions Bank did not make the requisite preliminary showing that the catastrophic loss in value of Allstate's bonds financing the SaltAire project could not have resulted from defendants' alleged misrepresentations about the extent of Regions Bank's loans to the project. (Doc. 227, at 59-62.) Although its reply brief expressly cites the *Caremark* decision on which Allstate relies (doc. 231, at 18), Regions Bank does not attempt to respond to or rebut this contention. Courts on summary judgment do not develop arguments or lines of research that the parties themselves did not, particularly in cases like this where the parties have been granted leave to submit literally hundreds of pages of summary judgment briefing.[34] For that reason, summary judgment on this ground is properly **denied**.[35]

---

[34] *See, e.g., Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (noting that a litigant "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions") (citation omitted); *Godfrey v. Nationwide Vinyl Siding & Home Imp., LLC*, 912 F. Supp.2d 1320, 1330 (S.D. Ala. 2012) ("On summary judgment, the Court cannot 'fill in the blanks' to formulate a legal argument that a party has not.").

[35] Even if Allstate were not correct in ascribing the initial burden on the summary judgment "loss causation" argument to Regions Bank, the result would be unchanged. Illinois courts have embraced a definition of "loss causation" as meaning "that the investor would not have suffered a loss if the facts were what he believed them to be." *Martin*, 643 N.E.2d at 747 (citation omitted). The facts, as Allstate understood them to be in early February 2008 when it approved the release of the bond proceeds, were that Regions Bank had committed to loan MBI an additional $2 million, thereby raising its total loan commitment on the project to $16.5 million. There appear to be genuine issues of material fact as to whether Allstate would have lost the value of its bond investment if Regions Bank actually had raised its total loan commitment to the SaltAire project to $16.5 million in February 2008. Regions Bank's efforts to (Continued)

E.      *The* **Moorman** *Doctrine.*

Another ground for summary judgment identified in Regions Bank's Motion for Summary Judgment (doc. 205, ¶ 20-21), albeit addressed only via footnote in its principal brief, concerns application of the *Moorman* doctrine to Count Two (negligent misrepresentation).  This feature of Illinois law provides that "purely economic loss [is] generally not recoverable in tort," and that for a plaintiff to recover economic losses proximately caused by a defendant's negligent misrepresentation, that defendant must be "in the business of supplying information for the guidance of others in their business transactions."  *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 337 (Ill. 2006) (citations omitted); *see also Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1201 (Ill. 1997) ("The focus of *Moorman*'s negligent misrepresentation exception to the economic loss doctrine is whether the defendant is in the business of supplying information for the guidance of others, or whether the information that is supplied is merely ancillary to the sale or in connection with the sale of merchandise or other matter.").

---

confine the loss causation analysis to the $2 million taken in isolation (*i.e.*, that whether Regions Bank did or did not loan $2 million to the project made no difference to SaltAire's ultimate success or failure) are flawed because they ignore both the context in which that $2 million commitment letter was issued (*i.e.*, Allstate's mistaken belief that Regions Bank already had $14.5 million in the project, which mistake of fact defendants sought to exploit, in plaintiff's view) and the object of the alleged misrepresentation (*i.e.*, to trick Allstate into thinking that Regions Bank had loaned a total of $16.5 million to the project).  The operative question for loss causation purposes is not whether an additional $2 million loan from Regions Bank in February 2008 would have made a difference, but is instead whether a total loan commitment of $16.5 million as of February 2008 would have made a difference.  Regions Bank's own expert appears to have answered the latter question in the affirmative.  (Husler Report (doc. 209-7), at 2 (opining that "this venture did not have sufficient capital to develop a project of this scale" and that SaltAire "failed to due to adverse market conditions and an inadequate capital structure").)  Furthermore, Allstate's representative testified, "Have we ever made a determination that 14.5 plus 2 million would make the deal work, I think the answer is yes."  (Quinn Dep., at 197.)  And defendant Jones acknowledged in his deposition that "[a]ny additional money on top of what Regions had loaned would have added to the success of the project."  (Jones Dep., at 151.)  On the strength of this and other record evidence, the Court cannot find at the summary judgment stage that Allstate will be unable to establish loss causation / proximate cause at trial, as a matter of law.

To bring a negligent misrepresentation claim within the parameters of the *Moorman* rule, "the plaintiff must demonstrate that the defendant: (1) is in the business of supplying information for the guidance of others in their business dealings; (2) provided false information; and (3) supplied the information for the guidance of the plaintiff's business transactions." *Tyler v. Gibbons*, 857 N.E.2d 885, 888 (Ill.App. 3 Dist. 2006). On summary judgment, Regions Bank challenges the first of these requirements.

Regions Bank's position is that it was not in the business of supplying information, and that the commitment letter was merely a "financial product" that cannot support an award of damages under the *Moorman* doctrine. (Doc. 205, ¶ 21.) Allstate counters that the "commitment letter was not a product" and that it was "solely meant to convey false information to Allstate." (Doc. 227, at 72.) Upon careful review of record facts and applicable law, the Court finds that genuine questions of material fact preclude entry of summary judgment on the issue of whether the *Moorman* doctrine bars Count Two. After all, "[t]o determine whether a party is in the business of supplying information, the precise facts of the specific case must be analyzed." *Fox Associates, Inc. v. Robert Half Int'l, Inc.*, 777 N.E.2d 603, 608 (Ill.App. 1 Dist. 2002) (citation omitted); *see also First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 823 N.E.2d 168, 169 (Ill.App. 1 Dist. 2005) (same). "The critical question … is whether the information is an important part of the product offered. A business will be deemed to be in the business of supplying information if the information furnished along with the non-informational goods or services is central to the business transaction." *Fox Associates*, 777 N.E.2d at 608 (citations and internal marks omitted); *see also First Midwest Bank*, 823 N.E.2d at 170 (same).

Recall that plaintiff's theory of the case – and its supporting evidence on summary judgment – is that Regions Bank and Jones never really intended to enter into a *bona fide* commitment letter. In this view, neither side ever meant for the $2 million loan referenced in said letter to come to fruition; rather, the sole, exclusive purpose of the commitment letter was to deceive Allstate. In other words, plaintiff's claim and its evidence are that the informational component of the commitment letter was the *raison d'etre* of that document. In the parlance of *Fox Associates*, the record viewed in the light most favorable to Allstate would support a reasonable inference that "the information furnished along with the non-informational goods or services [was] central to the business transaction." Plaintiff's point is that the informational content of the commitment letter was the only feature that mattered both to Regions Bank and to

-38-

MBI / Jones.  Upon viewing the facts through this prism, with the requisite summary judgment tilt in Allstate's favor, the undersigned finds that genuine issues of fact remain as to whether Regions Bank was "in the business of supplying information" as it relates to the particular challenged commercial transaction lying at the heart of Count Two.  Summary judgment is therefore inappropriate pursuant to the *Moorman* doctrine's limitations on negligent misrepresentation claims rooted in purely economic losses.

### F.      The Civil Conspiracy Claim.

Recall that Count Four of the First Amended Complaint asserts a cause of action for civil conspiracy against Regions Bank and Jones.  As pleaded, Count Four alleges that defendants "agreed to combine for the purpose of accomplishing concerted actions of fraudulent misrepresentation, and fraudulent concealment/suppression," and that they committed overt acts in furtherance of said agreement.  (Doc. 113, ¶¶ 48-49.)  Regions Bank moves for summary judgment as to Count Four, reasoning that "[n]o such tortious acts exist."  (Doc. 205, ¶ 23.)  In other words, Regions Bank's position is that Count Four should be dismissed because the substantive torts (Counts One, Two and Three) on which it rests are all meritless.  Regions Bank correctly posits that "if Allstate's claims in Counts One, Two, and Three fail, there are no 'tortious acts' to support a conspiracy claim."  (Doc. 210, at 16 n.15.)  As the Court has explained *supra*, however, Counts One and Two survive defendants' myriad summary judgment incursions.  Because there is sufficient evidence for these substantive causes of action to proceed to trial, Regions Bank's summary judgment argument as to Count Four (*i.e.*, that the conspiracy claim fails for want of underlying tortious conduct) cannot carry the day.[36]

In its reply brief, Regions Bank articulates for the first time a new argument that summary judgment should be granted as to Count Four for want of proof of an agreement by

---

[36]      In a footnote in its principal brief, Regions Bank elaborates by reciting an assortment of record facts from which it concludes that "[i]f Jones and Regions were truly conspiring to take advantage of Allstate's alleged 'mistaken belief' … they were exceptionally bad at implementing their alleged conspiracy."  (Doc. 210, at 16 n.15.)  This line of reasoning is fodder for closing argument at trial, not the stuff of Rule 56 relief.  Besides, if Allstate's theory is correct and the record is viewed in the light most favorable to Allstate, then defendants were exceptionally good at implementing their conspiracy because it was entirely successful in misleading Allstate into releasing bond proceeds without any real financial commitment from Regions Bank whatsoever, all without arousing the suspicions of any of the numerous sophisticated players involved.  Again, all of these arguments are properly reserved for trial.

Regions Bank and Jones to act in concert.  (Doc. 231, at 23-24.)  This new argument presented for the first time in a reply brief is improper.  *See, e.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) ("New arguments presented in reply briefs are generally not considered by federal courts.") (citations omitted); *Abrams v. Ciba Specialty Chemicals Corp.*, 663 F. Supp.2d 1220, 1232 n.16 (S.D. Ala. 2009) ("new arguments are impermissible in reply briefs").  At any rate, even if this argument were properly raised, the Court readily concludes that there is sufficient evidence in the record that, viewed in the light most favorable to Allstate, would support a jury determination by clear and convincing evidence that Regions Bank and Jones had indeed formed an agreement to act in concert in the specified manner.

For these reasons, entry of summary judgment is not appropriate as to Count Four.

### G.    Whether Allstate Received a Satisfaction via Credit Bids at Foreclosure.

Regions Bank's final ground for seeking summary judgment is that "the Full Credit Bids Made by Allstate's Alter Ego Extinguished the Bond Debt."  (Doc. 205, at 13.)  This argument rests on Regions Bank's contention that Belle Fontaine Holdco, LLC, acting as Allstate's alter ego, entered credit bids at foreclosure sales of SaltAire property in 2011 and 2012.  Generally speaking, "credit bidding" is a practice whereby a creditor bids on the debtor's property at a foreclosure sale using the amount of the outstanding debt, rather than cash, as payment.  Stated differently, credit bidding is a mechanism through which "[y]ou don't have to pay any money to do the bid.  You take what's owed to you and put that amount into the bidding process." (Quinn Dep., at 163.)[37]  Regions Bank maintains that, in making these credit bids, Holdco was acting as Allstate's alter ego.  Because its alter ego essentially traded the full outstanding bond debt for the foreclosed SaltAire assets, defendant's argument continues, Allstate received the one and only satisfaction to which it is entitled under Alabama law when those bids were accepted at the foreclosure auctions.[38]  Therefore, Regions Bank concludes, Allstate can prove no damages

---

[37]    Another witness explained credit bidding as "the ability to use some of the debt you're already owed to – rather than actually coming out of pocket with cash to bid at an auction, a foreclosure." (Bloom Dep. II, at 60-61.)

[38]    *See generally Turquoise Properties Gulf, Inc. v. Overmyer*, 81 So.3d 1250, 1255 n.3 (Ala. 2011) ("Alabama law generally bars double recoveries, and, although a party is entitled to full compensation for his injuries … he can gain but one satisfaction.") (citations and internal marks omitted).

resulting from the alleged fraudulent conduct of Regions Bank and Jones because it has already received one satisfaction of the bonds, by and through its alter ego.

While Allstate has raised a number of counterarguments, the Court need only consider one at this time.  Plaintiff's evidence is that the foreclosures were structured in such a manner that Holdco's bids did not extinguish the bonds.  Counsel for the District (the entity that actually foreclosed (doc. 225, Exhs. 77 & 78)) testified that Holdco's bids were "not a credit bid like a mortgage foreclosure," that "[n]o assessments or bonds were cancelled because of that foreclosure sale," and that "[i]t was not credited against anything that was owed."  (Anderson Dep., at 72-75.)  Indeed, that witness testified that the bid did not have "any effect on the assessments or the bonds." *Id.* at 75.  Moreover, counsel for the bond trustee testified that (i) the foreclosure was structured to run through Holdco precisely to allow the assessments to remain outstanding and not be extinguished, and (ii) the bond debt remained unpaid and outstanding following Holdco's successful bids at the foreclosure sale.  (Bloom Dep. II, at 60, 71, 80-81.) And Allstate witness Mary Quinn testified that, as a result of Holdco's successful bids, "you just take the property back and it hasn't reduced the amount that the bonds are still owed.  Bonds still are outstanding for the full amount."  (Quinn Dep., at 163.)

The Court understands that Regions Bank disagrees with each and every one of these witnesses.  The Court further understands Regions Bank's position that structuring the foreclosure sale in the manner that each of these witnesses says it was conducted would be improper (perhaps even fraudulent) under applicable law.  Be that as it may, the record evidence viewed in the light most favorable to Allstate reflects that the foreclosures were conducted in such a manner that Holdco's bids did not extinguish the bond debt; rather, the bond debt remained intact and unaffected.  In that event, of course, Allstate would not have received its one satisfaction under Alabama law by virtue of the foreclosure sales because it would not have swapped the outstanding bond debt for the foreclosed property.  The Court cannot and will not discard the testimony of multiple witnesses involved in the SaltAire foreclosure process regarding the manner in which that process played out, merely because Regions Bank contends it should not have been done that way (*i.e.*, that Holdco's bid should not have been accepted unless it was specifically tied to – and specifically wiped out – the Allstate debt).  If Regions Bank's thesis is correct, it shows only that the foreclosure sale was faulty.  That argument does not provide a viable basis at this juncture for rejecting the unequivocal testimony by witnesses for

the District, the bond trustee, and Allstate that, right or wrong, the foreclosure sale actually was structured in that manner, faulty or no.  As such, Regions Bank's argument that "the voluntary actions of Allstate's alter ego eliminated Allstate's debt and also its purported damages" (doc. 210, at 54), notwithstanding abundant evidence to the contrary, cannot succeed at the summary judgment stage.

> ### H.   Defendant Jones' Summary Judgment Motion.

As noted, defendant George Jones, proceeding *pro se*, filed his own Motion for Summary Judgment (doc. 211).  Insofar as Jones simply adopts and incorporates the Rule 56 Motion and associated filings of Regions Bank, his Motion does not require separate treatment; rather, those issues and arguments are resolved in the same manner with respect to defendant Jones as they are to defendant Regions Bank.

In addition to adopting his co-defendant's arguments, Jones asserts several independent grounds for summary judgment.  As a threshold matter, he contests personal jurisdiction.  This argument courts frivolity.  During the time that Jones worked on the SaltAire project (which was to be developed in the Southern District of Alabama), he was living in Alabama, maintaining offices in Alabama, and traveling to and within Alabama to conduct SDG business relating to the SaltAire project.  (Doc. 229, Exhs. A, B & C.)  In April 2008, Jones executed an agreement in Alabama pursuant to which Jones accepted employment as manager of SDG, whose business was recited as being to "operate diversified real estate services involved in the development, construction and operations of real estate assets in Mobile County."  (Doc. 229, Exh. D.)  That agreement listed an address for Jones in Alabama.  (*Id.*)  The Articles of Organization for SDG provided that Jones was the entity's registered agent, and reflected a mailing address for him in Mobile, Alabama.  (Doc. 229, Exh. P.)  Allstate's claims asserted against Jones in this action arise from and relate directly to Jones' activities in Alabama (*i.e.*, his work on the SaltAire project and the representations he made to Allstate concerning the financing status of same).

Examining these record facts through the framework of specific jurisdiction yields an unambiguous conclusion that personal jurisdiction is properly exercised over Jones here.  "In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum

state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (citations omitted).  The first prong is plainly satisfied, as the aforementioned facts confirm the existence of a "direct causal relationship between the defendant, the forum, and the litigation." *Id.* at 1356.  Allstate's claims against Jones relate directly to his activities in this forum in 2007 and 2008.  As for the second prong, given that Jones was performing extensive work for the SaltAire development in Alabama, there can be no doubt that he "purposefully availed himself of the privileges of doing business within the forum" and "should reasonably anticipate being haled into court in the forum." *Id.* at 1357.  And Jones has failed to make even a colorable showing that the exercise of personal jurisdiction over him in Alabama would be so burdensome or inefficient as to be inconsistent with traditional notions of fair play and substantial justice.  *See id.* at 1355 (where plaintiff has established the first two prongs, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice") (citation omitted).  Personal jurisdiction properly lies over George Jones in Alabama in this case, and his Motion for Summary Judgment is due to be **denied** to the extent it argues otherwise.

Next, Jones seeks summary judgment on the ground that was "operating as a Corporate Officer, Member, or Manager," and that he "never acted in an individual capacity."  (Doc. 211, at 3.)  This argument misapprehends fundamental principles of tort and agency law.  The First Amended Complaint alleges that Jones committed certain tortious conduct, in the form of fraudulent / negligent misrepresentations and conspiring with Regions Bank to make such misrepresentations.  If Jones committed those torts, it makes no legal difference whether he did so in a representative / agency capacity or not.  Either way, he would remain liable for his own tortious conduct.  *See, e.g., Ex parte McInnis*, 820 So.2d 795, 798-99 (Ala. 2001) ("A corporate agent who personally participates, albeit in his or her capacity as such agent, in tort is personally liable for the tort.").[39]  Thus, whether Jones acted in an individual or representative capacity is irrelevant.

---

[39]      *See also Ex parte Charles Bell Pontiac–Buick–Cadillac–GMC, Inc.*, 496 So.2d 774, 775 (Ala. 1986) ("In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity."); *Galactic Employer Services, Inc. v. McDorman*, 880 (Continued)

-43-

Jones raises various other summary judgment arguments, relating to timeliness, Allstate's notice of the alleged fraud, and Allstate's diligence (or lack thereof) in investigating or ascertaining the truth about Regions Bank's financing status in connection with SaltAire. Each of those points has already been examined and considered in the context of Regions Bank's Motion for Summary Judgment; therefore, no constructive purpose would be served by replowing that ground anew in the context of Jones' Rule 56 Motion.

In short, Jones' Motion for Summary Judgment does not alter the landscape or the overall analysis. Jones is entitled to dismissal of Count Three (fraudulent concealment) against him for the same reasons that Regions Bank is. In all other respects, however, Jones' Motion for Summary Judgment is **denied**.

## VI.  Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.  Regions Bank's Motion to Strike Declaration of Stephen S. Peterson (doc. 230) is **denied**;

2.  The sealed exhibits filed at docket entry 226 without prior leave of court will be unsealed unless a properly supported motion to seal is filed in or before **July 24, 2015**;

3.  The Motions for Summary Judgment (docs. 205, 211) filed by defendants Regions Bank and George Jones are **granted in part**, and **denied in part**;

---

So.2d 434, 437 n.2 (Ala.Civ.App. 2003) ("An individual is personally liable for all torts which that individual committed, notwithstanding the person may have acted as an agent or under directions of another.... [I]f a corporate officer participates in the wrongful conduct, or knowingly approves the conduct, the officer, as well as the corporation, is liable for the penalties.") (citation omitted); *Ex parte Jamar*, 703 So.2d 879, 882 n.1 (Ala.1996) (See, J., concurring) ("[W]hether he is acting on his own behalf or for another, an agent who violates a duty which he owes to a third person is answerable to the injured party for the consequences.... In accordance with these principles, an agent or other employee, has been held liable to a third person for his own negligence.") (citation omitted). The same holds true under Illinois law. *See, e.g., Safeway Ins. Co. v. Daddono*, 777 N.E.2d 693, 696 (Ill.App. 1 Dist. 2002) ("while corporate status generally shields corporate officers and shareholders from liability from corporate debts and obligations, this protection does not shield corporate officers from their own wrongdoing").

4.      Those Motions for Summary Judgment are **granted** with respect to Count Three (fraudulent suppression/concealment) of the First Amended Complaint, and that cause of action is **dismissed**;

5.      In all other respects, defendants' Motions for Summary Judgment are **denied**; and

6.      This action remains set for Final Pretrial Conference on **July 23, 2015** at **2:00 p.m.**  Jury selection will be conducted on **August 4, 2015**, with trial to follow in the **August 2015** civil term.


DONE and ORDERED this 2nd day of July, 2015.


s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE